## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| CME Acquisitions, LLC<br><br>　　　　　　Plaintiff<br><br>**v.**<br><br>United States,<br><br>　　　　　　Defendant,<br><br>　　and<br><br>North American Stainless and Outokumpu Stainless USA, LLC,<br><br>　　　　　　Defendant-Intervenors. | Court No. 1:24-cv-00032 |

## RESPONSE BRIEF OF DEFENDANT-INTERVENORS IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

William H Jones Jr
**VanAntwerp Attorneys, LLP**
1544 Winchester Ave. 5th Fl
PO Box 1111 Ashland
KY 41105-1111
Phone: 606-329-2929
Email: wjones@vanattys.com
*Counsel for North American Stainless*

Deanna Tanner Okun
Lydia C. Pardini
Alissa Chase
Joonho Hwang
**Polsinelli PC**
1401 I St NW, Washington, DC 20005
Telephone: (202) 783-3300
*Counsel for Outokumpu Stainless USA LLC*

Dated: November 26, 2024

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................1

STATEMENT PURSUANT TO RULE 56.2 .......................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

SUMMARY OF ARGUMENT ................................................................................................ 6

ARGUMENT ..............................................................................................................................7

    I.    Commerce Assigned a Rate to Non-Selected Respondents in This Review That Was Reasonable, Supported by Substantial Evidence, and in Accordance with Law ....................... 7

    II.    The Burden Was on CME To Rebut the Reasonableness of the Expected Method Rate, Not on Commerce to Justify It ............................................................................................... 10

    III.    CME Had Ample Opportunity to Rebut the Presumption of Reasonableness of the Expected Method and Failed to Do So........................................................................................ 14

    IV.    The Rate Commerce Applied Pursuant to the Expected Method Was Reasonable.......... 16

CONCLUSION ........................................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Albemarle Corp. v. United States,*
   821 F.3d 1345 (Fed. Cir. 2016) .................................................................................... passim

*Changzhou Hawd Flooring Co. v. United States*,
   848 F.3d 1006 (Fed. Cir. 2017) ............................................................................................ 11

*Loper Bright Enterprises v. Raimondo*, \
   144 S. Ct. 2244 (June 28, 2024) ........................................................................................... 13

*Nat'l Knitwear & Sportswear Ass'n v. United States*,
   779 F.Supp. 1364, 15 C.I.T. 548 (1991) ............................................................................. 12

*PrimeSource Bldg. Prod., Inc. v. United States*,
   111 F.4th 1320 (Fed. Cir. 2024) .................................................................................... passim

*Pro-Team Coil Nail Enter. v. United States*,
   587 F. Supp. 3d 1364 (Ct. Int'l Trade July 15, 2022) ................................................. 11, 13

*Tung Mung Development Co., Ltd. v. United States*,
   354 F.3d 1371 (Fed. Cir. 2004) .............................................................................................. 3

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013) ........................................................................................... 13

**Statutes**

19 C.F.R. § 351.301(c)(3)(ii) ....................................................................................................... 15

19 U.S.C. § 1673d(c)(1)(B) ............................................................................................................. 8

19 U.S.C. §  1673d(c)(5)(A)) .......................................................................................................... 8

19 U.S.C. § 1673d(c)(5)(B) .................................................................................................... passim

19 U.S.C. § 1677d(c) ..................................................................................................................... 16

19 U.S.C. § 1677f-1(c)(2) ......................................................................................................... 8, 11

**Other Authorities**

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List,*
87 Fed. Reg. 39,461 (Dep't Commerce Jul. 1, 2022) ................................................................ 4

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
87 Fed. Reg. 54,463 (Dep't Commerce Sept. 6, 2022) ............................................................. 4

*Stainless Steel Sheet and Strip in Coils from Taiwan,*
64 Fed. Reg. 30,592 (Dep't Commerce June 8, 1999) ............................................................. 2

*Stainless Steel Sheet and Strip in Coils from Taiwan,*
69 Fed. Reg. 67,311 (Dep't Commerce Nov. 17, 2004) ........................................................... 3

*Stainless Steel Sheet and Strip in Coils from Taiwan,*
75 Fed. Reg. 5,947 (Dep't Commerce Feb. 5, 2010) .............................................................. 3

*Stainless Steel Sheet and Strip in Coils from Taiwan,*
75 Fed. Reg. 76,700 (Dep't Commerce Dec. 9, 2010) ....................................................... 3, 4, 7

*Stainless Steel Sheet and Strip in Coils From Taiwan,*
89 Fed. Reg. 902 (Dep't Commerce Jan. 8, 2024) ....................................................... 1, 2, 6, 17

*Stainless Steel Sheet and Strip in Coils from United Kingdom, Taiwan and South Korea,*
64 Fed. Reg. 40,555 (Dep't Commerce Jul. 27, 1999) ............................................................ 3

The Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
H.R. Doc. 103-316, vol. 1 (1994)...................................................................................... passim

**Regulations**

Section 777A(c)(2) of the Act.......................................................................................... 6, 7, 8, 11

**Administrative Decisions**

Decision Memorandum for the Preliminary Results of the 2021-2022 Administrative Review of the Antidumping Duty Order on Stainless Sheet and Strip in Coils from Taiwan (Mar. 31, 2023)................................................................................................................................. 4, 5

Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review; 2021-2022: Stainless Steel Sheet and Strip in Coils from Taiwan (Dec. 29, 2023) ...................................................................................................................................... passim

## INTRODUCTION

Pursuant to Rule 56.2 of this Court's Rules, Defendant-Intervenors, North American Stainless and Outokumpu Stainless USA, LLC ("Defendant-Intervenors"), respectfully submit this response to the motion for judgment on the agency record filed by Plaintiff CME Acquisitions, LLC ("CME"). Pl.'s Rule 56.2 Mot. for J. on the Agency Record, Aug. 21, 2024, ECF 31.  CME challenges the final results of the U.S. Department of Commerce's ("Commerce") administrative review of the antidumping duty ("AD") order on stainless steel sheet and strip in coils from Taiwan covering the 2021-2022 period of review ("2021-2022 administrative review"), in which Commerce applied the expected methodology to determine the dumping rate for respondents not selected for individual examination.  *Stainless Steel Sheet and Strip in Coils From Taiwan*, 89 Fed. Reg. 902 (Dep't Commerce Jan. 8, 2024) (final results of administrative review) (*Final Results*).

For the reasons set forth below, Commerce's *Final Results* are supported by substantial evidence and in accordance with law.  In the absence of record information supporting a conclusion that the expected methodology yielded a rate not reasonably reflective of the potential dumping margin of the non-selected respondents, Commerce applied the method that Commerce is statutorily expected to use to determine a rate for non-selected respondents.  Therefore, the Defendant-Intervenors respectfully request that this Court sustain the *Final Results* of Commerce's administrative review and enter judgment in favor of Defendant United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.    The Administrative Determination under Review

The administrative determination under review is the final result of the administrative review of the AD order on stainless steel sheet and strip in coils from Taiwan.  The challenged determination was published in the *Federal Register* on January 8, 2024. *Final Results*, 89 Fed.

Reg. 902 (Dept' Commerce Jan. 8, 2024).  The determinations and findings challenged in this

appeal by CME are described in detail in the "Issues and Decision Memorandum" accompanying

the *Final Results*. Commerce Memorandum, " Issues and Decision Memorandum for the Final

Results of the Antidumping Duty Administrative Review; 2021-2022: Stainless Steel Sheet and

Strip in Coils from Taiwan" (Dec. 29, 2023) (P.R. 67) ("*Final Results* IDM").

## II.    Issues Presented for Review

CME presents one issue for this Court's review:  whether, in the absence of any

calculated rates in the administrative review that were not zero, *de minimis*, or based entirely on

adverse facts available, Commerce's decision to assign to the companies not selected for

individual examination the same facts available rate as that assigned to the only two mandatory

respondents was supported by substantial evidence and in accordance with law.

## III.    Request for Court Order and Relief

The Defendant-Intervenors respectfully request that this Court deny CME's motion for

judgment on the agency record and sustain Commerce's *Final Results*.

## STATEMENT OF FACTS

On June 8, 1999, Commerce issued its final determination that stainless steel sheet and

strip in coils ("SSSS") from Taiwan was being sold in the United States at less than fair value, as

provided in Section 735 of the Tariff Act of 1930, as amended ("the Act"). *See Stainless Steel*

*Sheet and Strip in Coils from Taiwan*, 64 Fed. Reg. 30,592 (Dep't Commerce June 8, 1999)

(notice of final determination of sales at less than fair value).  The dumping margins calculated

for individually examined companies ranged from 0.98 percent to 34.95 percent while an all-

others rate was calculated as 12.61 percent. *Id.* at 30,624.  Subsequently, on July 27, 1999,

Commerce issued an AD order on subject merchandise from Taiwan. *See Stainless Steel Sheet*

*and Strip in Coils from United Kingdom, Taiwan and South Korea*, 64 Fed. Reg. 40,555 (Dep't

Commerce Jul. 27, 1999) (notice of antidumping duty order).  Certain respondents appealed, and as a result of that litigation, in 2004, Commerce amended its final determination to align with the final results of its remand redetermination sustained by the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"). *Stainless Steel Sheet and Strip in Coils from Taiwan*, 69 Fed. Reg. 67,311 (Dep't Commerce Nov. 17, 2004) (notice of amended final determination in accordance with court decision); *see also Tung Mung Development Co., Ltd. v. United States*, 354 F.3d 1371 (Fed. Cir. 2004).  Specifically, Commerce's amended final determination calculated a dumping margin of 21.1 percent for SSSS from Taiwan produced or exported by Yieh United Steel Corporation ("YUSCO"), but a higher 36.44 percent rate under its "middleman-dumping" methodology when YUSCO material was exported through Ta Chen to the United States.  *Id.*

       Between issuance of the 1999 AD order and initiation of the 2021-2022 administrative review, Commerce completed only ten administrative reviews of the subject merchandise from Taiwan.  The most recently completed administrative review covered the period July 1, 2008, through June 30, 2009 – *i.e.*, conduct more than a decade stale by the time Commerce initiated this 2021-2022 administrative review. *See Stainless Steel Sheet and Strip in Coils from Taiwan*, 75 Fed. Reg. 76,700 (Dep't Commerce Dec. 9, 2010) (final results of 2008-2009 antidumping duty administrative review).  In that 2008-2009 review, Commerce assigned a zero percent margin to the only individually examined respondent, and 4.30 percent to the non-selected respondents. *Id.* at 76,703.  The 4.30 percent rate was carried forward from the 2007-2008 review. *See Stainless Steel Sheet and Strip in Coils from Taiwan*, 75 Fed. Reg. 5,947, 5,949 (Dep't Commerce Feb. 5, 2010) (final results of 2007-2008 antidumping duty administrative review) (calculating and assigning the 4.30 percent rate to the only respondent subject to the

review); *Stainless Steel Sheet and Strip in Coils from Taiwan*, 75 Fed. Reg. at 76,700(carrying forward rate from prior review).

In July 2022, Defendant-Intervenors requested an administrative review of the subject merchandise from Taiwan that entered the United States during the period July 1, 2021, through June 30, 2022. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 87 Fed. Reg. 39,461 (Dep't Commerce Jul. 1, 2022). In September 2022, Commerce initiated the 2021-2022 administrative review. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 54,463 (Dep't Commerce Sept. 6, 2022).

Commerce selected the two largest exporters and producers during the period of review, Lien Kuo Metal Industries Co., Ltd. and S More Steel Materials Co., Ltd., as the two mandatory respondents for the 2021-2022 administrative review. Commerce Memorandum, "Decision Memorandum for the Preliminary Results of the 2021-2022 Administrative Review of the Antidumping Duty Order on Stainless Sheet and Strip in Coils from Taiwan," at 7 (Mar. 31, 2023) (P.R. 49) ("PDM"). Shortly thereafter, both mandatory respondents notified Commerce of their intent to not participate in the review. *Id.* Subsequently, the Defendant-Intervenors submitted pre-preliminary comments, arguing that Commerce should assign to the mandatory respondents rates determined pursuant to the facts available with an adverse inference due to the companies' failure to participate; Defendant-Intervenors further contended that under the applicable statutory framework and because the import volume from the largest exporters and producers is presumed to be representative of all exporters and producers covered by the administrative review, Commerce should also preliminarily apply the same rate to the non-selected respondents. *See generally* Letter from the Domestic Interested Parties, "Domestic

Interested Parties' Pre-Preliminary Comments," at 2-9 (Feb. 17, 2023) (P.R. 47).  No other party submitted any comments or factual information. *See* Index of Admin. R. at 5-12, Apr. 15, 2024, ECF 26.

Commerce issued its preliminary results, assigning the 21.10 percent rate determined pursuant to facts available with an adverse inference to the mandatory respondents. PDM at 9-10. However, rather than preliminarily assign the same rate to non-selected respondents, Commerce instead pulled forward the 4.30 percent rate from the 2008-2009 administrative review. *Id.* at 7.

The Defendant-Intervenors submitted a case brief to assert that Commerce's preliminary results erred in preliminarily pulling forward the 4.30 percent rate for the non-selected respondents. *Final Results* IDM at 5-6.  The Defendant-Intervenors contended, as they did in pre-preliminary comments, that in the absence of any record information indicating the rate assigned to the two mandatory respondents was not reasonably reflective of the dumping margins of the non-selected respondents, Commerce's preliminary assignment of the decade-old rate was inconsistent with the statute and court precedent. *See id.*  CME submitted a rebuttal brief, for the first time arguing that Commerce should continue to apply in its final results the 4.30 percent rate to the non-selected respondents. *See id.* at 6-8.

Throughout the 2021-2022 administrative review, no party submitted any factual information informing dumping rates during the period of review. *See* Index of Admin. R. at 5-12 (Apr. 15, 2024), ECF 26.

In December 2023, Commerce issued its *Final Results*.  Commerce continued to apply the 21.10 percent rate, which was determined pursuant to facts available with an adverse inference, to both mandatory respondents that declined to participate. *See Final Results* IDM at 15.  However, in a shift from its preliminary determination, Commerce assigned the same rate of

21.10 percent to the non-selected respondents. *Id.* Specifically, Commerce determined that it "ha{s} applied the 'expected method,' as intended by Congress . . . consistent with {its} practice and the prevailing law . . . ." *Id.* at 9. Addressing CME's argument that the agency should continue to carry forward the 4.30 percent rate, Commerce concluded that that rate was first calculated during periods of review "that were over ten years ago and cannot reasonably provide insight into potential dumping margins or activity of the respondents for this {period of review}." *Id.* at 14. In addition, Commerce determined that it did "not find evidence that the overall market has not changed since the 2007-2008 POR such that pulling forward the rate from that review would overcome the preference for contemporaneity." *Id.*

CME appealed Commerce's *Final Results*, *see* Summons, Feb. 6, 2024, ECF 1; Pl.'s Complaint, Mar. 6, 2024, ECF 9, resulting in the instant litigation.

## SUMMARY OF ARGUMENT

Under the circumstances presented in this 2021-2022 administrative review, Commerce correctly applied the method it was statutorily expected to use – the "expected method" – to determine the applicable rate for non-selected respondents. When Commerce limits its examination to a reasonable number of exporters and producers under Section 777A(c)(2) of the Act, in administrative reviews and the respondents selected for individual examination each receive rates that are zero, *de minimis*, or based entirely on the application of facts available, Commerce may use any reasonable method to calculate a rate for the non-selected respondents. The Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA") sets forth that the expected method under such circumstances is to "weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available." This Court and the Federal Circuit have also held that weight-

averaging the margins determined pursuant to the facts available is the expected method for Commerce to apply. Otherwise, to deviate from the expected method, Commerce must affirmatively determine, based on substantial evidence, that the expected method is not feasible or would not be reasonably reflective of the potential dumping margin of the non-selected respondents. Because Commerce not only correctly applied the expected method but determined that there was no reason to deviate from the expected method, Commerce's averaging the two mandatory respondents' rates determined pursuant to facts available was reasonable.

CME disregards court precedent, including the Federal Circuit's recent holding in *PrimeSource Bldg. Prod., Inc. v. United States*, 111 F.4th 1320 (Fed. Cir. 2024), which is dispositive on this case. Further, CME falsely attempts to shift the burden to Commerce to justify a departure from the expected method and to rebut the presumption that the import volume from the largest exporters and producers is representative of that from all exporters and producers covered by the administrative review. CME had ample opportunity to provide Commerce with factual information demonstrating that the expected method would yield unrepresentative results during the administrative review and failed to do so. Commerce's application of the expected method in the *Final Results* is therefore supported by substantial evidence and in accordance with the statutory framework and court precedent. For these reasons, this Court should deny CME's motion for judgment upon the agency record.

**ARGUMENT**

**I.    Commerce Assigned a Rate to Non-Selected Respondents in This Review That Was Reasonable, Supported by Substantial Evidence, and in Accordance with Law**

The rate assigned by Commerce to non-selected respondents in this administrative review was consistent with the expected method and in accordance with law. Pursuant to Section 777A(c)(2) of the Act, if Commerce determines that it is not practicable to determine individual

Case 1:24-cv-00032-GSK    Document 35    Filed 11/26/24    Page 12 of 24

dumping margins due to the large number of exporters or producers covered in the administrative review, Commerce may limit its examination to a reasonable number of exporters or producers. 19 U.S.C. § 1677f-1(c)(2). When Commerce limits the number of individually examined exporters, it normally calculates a rate for the non-selected respondents by weight-averaging the dumping margins calculated for the mandatory respondents, excluding any margins that are zero, *de minimis*, or determined entirely based on facts available. *See PrimeSource Bldg. Prod., Inc. v. United States*, 111 F.4th 1320, 1324-25 (Fed. Cir. 2024) ("*PrimeSource*") (citing 19 U.S.C. § 1673d(c)(1)(B), (c)(5)(A)).

In situations where there are only zero, *de minimis*, or rates based entirely on the application of facts available, Commerce must still determine a rate for non-selected respondents. Under Section 735(c)(5)(B) of the Act, if the estimated weighted-average dumping margins established for all exporters and producers individually investigated are either zero, *de minimis,* or are determined entirely by application of facts available, Commerce may use any reasonable method to establish the rate for non-selected companies. *See* 19 U.S.C. § 1673d(c)(5)(B) (emphasis added). The SAA[1] sets forth the expected method to be used in such cases: "weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available." *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 873. The SAA further states that if the expected method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-selected companies, Commerce may use other reasonable methods to calculate the rate for those non-

---

[1] As the Federal Circuit has noted, the SAA is "the congressionally mandated authoritative expression of the Tariff Act in judicial proceedings." *PrimeSource*, 111 F.4th at 1329 (citations omitted) (internal quotations omitted).

selected companies. *Id*; *see also Albemarle Corp. v. United States,* 821 F.3d 1345, 1352 (Fed. Cir. 2016) ("*Albemarle*").

In light of this statutory framework and congressional mandate, when there are no individually-calculated rates in an administrative review that are *not* zero, *de minimis*, or determined pursuant to the facts available, the courts have held that it is an "expected method" for Commerce to average those normally-discarded rates to calculate the rate for the companies not individually selected for examination. *See generally PrimeSource*, 111 F.4th 1320 (holding as such with respect to weight-averaging rates based on adverse facts available ("AFA") for non-selected company rates); *see also Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) ("*Albemarle*") (same with regards to *de minimis* rates).  Moreover, although 19 U.S.C. § 1673d(c)(5)(B), as informed by the SAA, speaks directly to the calculation of rates for non-selected respondents in investigations, in the absence of clear statutory direction for calculation of rates for non-selected respondents in administrative reviews, Commerce and courts have consistently looked to the same language to inform the agency's calculation of rates for non-selected companies in administrative reviews. *See, e.g., Albemarle*, 821 F.3d 1345; *PrimeSource*, 111 F.4th 1320.

*PrimeSource* is dispositive on this case and serves as the basis for this Court to deny CME's motion for judgment upon the agency record. *See generally PrimeSource*, 111 F.4th 1320.  There, non-selected respondents appealed the Court of International Trade's opinion sustaining Commerce's use of the expected method to weight-average the rates individually determined pursuant to facts available for the mandatory respondents to calculate a rate for the non-selected respondents. *Id.* at 1323-24.  The Federal Circuit in *PrimeSource* rejected the appellants' argument that Commerce must undertake an examination of the non-selected

respondents to show that its calculated rate reasonably reflects the non-selected respondents'
actual dumping margin. *Id.* at 1329.  Reviewing the text of the statutory provisions and SAA, the
Federal Circuit held that weight-averaging the rates determined pursuant to facts available for the
two mandatory respondents was the expected method for Commerce to calculate the rate for the
non-selected respondents. *Id.*  After all, "there is no contradiction between the statute and the
SAA.  The statute requires selecting 'any reasonable method,' . . . and the SAA merely
prescribes what the default methodology is expected to be when volume data is available . . . ."
*Id.*; *see also* 19 U.S.C. § 1673d(c)(5)(B); SAA at 4201.

Consistent with the Federal Circuit's holding in *PrimeSource*, to determine the non-
selected companies' rates in the 2021-2022 administrative review, Commerce was statutorily
expected to average the mandatory respondents' rates.  Commerce complied with that
congressional mandate.  In this instant case, as in *PrimeSource*, all mandatory respondents
received rates based entirely on facts available, and Commerce therefore averaged those two
identical rates to determine the non-selected company rate. *See generally PrimeSource*, 111
F.4th 1320; *Final Results* IDM at 4, 15.  Furthermore, the Federal Circuit in *PrimeSource* found
this methodology to be appropriate even where one of the non-respondents in *PrimeSource*
informed Commerce of its intent to submit questionnaire responses as a voluntary respondent; in
the 2021-2022 administrative review, none of the non-selected respondents (including CME or
its supplier) indicated willingness to provide information on which Commerce could calculate an
individual rate at all.  Consistent with *PrimeSource* and the statutorily expected method,
Commerce's averaging the two mandatory respondents' rates to determine the rate for non-
selected respondents in this administrative review was reasonable.

## II.    The Burden Was on CME To Rebut the Reasonableness of the Expected Method Rate, Not on Commerce to Justify It

To contest Commerce's *Final Results*, CME flips the presumption underpinning use of the expected method from one of reasonableness to unreasonableness. *See* CME's Mot. at 13. CME does so in direct contravention of *PrimeSource*, which is clear: "Commerce may use 'other reasonable methods'" to determine a non-selected company's rate, "*but only* if Commerce reasonably concludes that the expected method is 'not feasible' or 'would not be reasonably reflective of potential dumping margins.'" *PrimeSource*, 111 F.4th at 1330 (citing *Albemarle*, 821 F.3d at 1352, and *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017)) (emphasis in the original).

The presumption of the expected method's reasonableness is intentional. To place an affirmative burden on Commerce to investigate the non-selected respondents and determine that the expected method would be reasonably reflective of their dumping margins "would contravene the purpose of those statutory provisions that allow Commerce to limit the number of parties individually investigated under certain circumstances." *Id.* at 1330. When Commerce determines that it is not practicable to calculate individual dumping margins for each exporter or producer and limits its examined respondents pursuant to Section 777A(c)(2) of the Act (19 U.S.C. § 1677f-1(c)(2)), it does so with the presumption that the dumping margin for the largest exporters and producers is representative of all exporters and producers. This aligns with precedent from this Court and the Federal Circuit: "{t}he very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." *Albemarle*, 821 F.3d at 1353; *see also Pro-Team Coil Nail Enter. v. United States*, 587 F. Supp. 3d 1364 (Ct. Int'l Trade July 15, 2022). The courts have further held that "the representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such

respondents." *Albemarle*, 821 F.3d at 1353 (citing *Nat'l Knitwear & Sportswear Ass'n v. United States*, 779 F.Supp. 1364, 1373–74, 15 C.I.T. 548, 559 (1991)).

Because the dumping margins calculated for the largest producers and exporters selected for individual examination are presumed to be representative of the rates for non-selected respondents, the burden to rebut the presumption of representativeness is on the party wishing to depart from the expected method, and the party must show that the non-examined companies' dumping is different from the mandatory respondents. *See PrimeSource*, 111 F.4th at 1331.  In *PrimeSource*, the two mandatory respondents received margins determined pursuant to facts available – just like the mandatory respondents in the 2021-2022 administrative review. Commerce used the expected method to weight-average the two rates to calculate the all-others rate, which was sustained by this Court and on appeal at the Federal Circuit. *See id.* at 1326-28. The appellants in *PrimeSource* contended that the weight-average of the margins determined pursuant to facts available had no relationship to the non-selected companies' dumping margins during the period of review. *Id.* at 1332.  The Federal Circuit rejected the argument, holding that:

> {t}he mere fact that all mandatory respondents received an AFA rate cannot, in and of itself, undermine the presumption of representativeness. . . . An AFA rate will therefore always be at least partially based on data that are not contemporaneous to the current proceeding. Simply pointing out the realities of the statutory framework when a respondent receives an AFA rate does nothing to undermine the presumption of representativeness of the mandatory respondents.

*Id.* at 1332-33.

Facing a bleak record on which to claim the expected method yielded a rate not reasonably reflective of its suppliers' dumping margin, CME instead flips the burden on its head and contends it was on Commerce to justify its use of the expected method, rather than on CME to rebut it. *See* CME's Mot. at 2.  To support its argument, CME relies on *Bestpak* to argue that Commerce did not consider "fairness or accuracy and the principle that rate determinations for

nonmandatory, cooperating separate rate respondents must also bear some relationship to their actual dumping margins." CME's Mot. at 13, 15-16 (citing *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1380 (Fed. Cir. 2013)) (internal quotations omitted). In so doing, however, CME ignores that the Federal Circuit in *PrimeSource* explicitly qualified *Bestpak*, holding that "*Bestpak* does not address Commerce's burden when it calculates the all-others rate using the expected method," and that "{t}he burden is on Commerce to justify a departure from the expected method, *not to justify its use*." *PrimeSource*, 111 F.4th at 1330-31.

To elevate *Bestpak* over *PrimeSource*, CME contends that *PrimeSource* rested on Commerce's construction of the statutory language as the basis of its opinion and thus failed to follow the holding of the U.S. Supreme Court's holding in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (June 28, 2024) ("*Loper Bright*"). *See* CME Mot. at 14. As a threshold matter, the Federal Circuit's opinion in *PrimeSource* was issued nearly two months after the issuance of *Loper Bright*; to the extent that the parties to *PrimeSource* believed the Federal Circuit's holding in *PrimeSource* failed to incorporate *Loper Bright*, appellants could have requested reconsideration of the opinion *en banc* or sought appeal. They did not, *see PrimeSource*, Consol. Court No. 2022-2129, ECF No. 7 (Mandate to U.S. Court of International Trade), and *PrimeSource* remains binding precedent on this court. Further, while CME contends that *Loper Bright* "forecloses this Court from affirming Commerce's decision merely upon finding that the government's statutory interpretations are 'reasonable,'" *see* CME Mot. at 14, it does not foreclose this court from looking directly to the statutory language and the SAA – as the Federal Circuit did most recently in *PrimeSource* – to conclude that when faced with individual rates all of which are based entirely on facts available, it remains the expected method to apply that rate to non-selected respondents in the absence of record information indicating that rate would not be reasonably reflective of a

non-selected company's dumping margin. *PrimeSource*, 111 F.4th at 1330-32; *Albemarle*, 821 F.3d at 1349.

Further, relying on *Bestpak*, CME contends that Commerce did not actually apply the expected method to assign a rate to the non-selected companies because "Commerce did not use a weighted average to calculate the ADD margins of the 'all other' companies." CME's Mot. at 15-16. The two mandatory respondents in the 2021-2022 administrative review both received the same 21.1 percent rate; there is no substantive difference between weight averaging and simple averaging 21.1 percent with 21.1 percent to apply the expected method. Commerce stated it was following the expected method, *Final Results* IDM at 15, and the assigned rate is correct under either averaging methodology.

### III.    CME Had Ample Opportunity to Rebut the Presumption of Reasonableness of the Expected Method and Failed to Do So

Having failed convincingly argue the inapplicability of *PrimeSource* to these facts or to shift the burden to Commerce to justify its use of the expected method in the 2021-2022 administrative review, CME contends that the record before Commerce undermines the agency's determination that the expected method yielded a rate reasonably reflective of its suppliers' dumping margins. Specifically, CME points to Commerce's calculated rates in previous administrative reviews under this AD order and argues that Commerce's use of the expected method is not supported by substantial evidence because the expected method does not reflect those rates and trend. *See* CME's Mot. at 17-18. However, the Federal Circuit rejected a similar line of reasoning in *PrimeSource*. Appellants in that litigation argued that the history of rates in the proceeding, rather than a trend of non-cooperation, demonstrated that respondents received low, calculated rates far more often than the rates determined pursuant to facts available. *See PrimeSource*, 111 F.4th at 1333. There, the Federal Circuit held that Commerce came to the

reasonable conclusion that the facts did not support a departure from the expected method as Commerce found that "73 of 75 of the non-examined companies ha{d} never been examined any segment of the proceeding and that there {wa}s no evidence on th{e} record or any other record that the {rate determined pursuant to the facts available for the mandatory respondents} does not reflect their commercial reality." *Id.* at 1334. The same is true in this proceeding. The last calculated rates in this proceeding were based on sales activity in 2009, and Commerce determined that the 4.3 percent rate for which CME argued "relate{s} to {periods of review} that were over ten years ago and cannot reasonably provide insight into potential dumping margins or activity of the respondents for this {period of review}." *Final Results* IDM at 14.

To explain the dearth of any other record evidence undermining the reasonableness of the expected method, CME now argues that Commerce "deprived the public – including importers like CME . . . – of a meaningful opportunity to comment on" its use of the expected method. CME's Mot. at 2-3, 11. However, Commerce has been statutorily expected to apply the expected method since well before the initiation of the 2021-2022 administrative review. *See, e.g.,* SAA at 873; 19 U.S.C. § 1673d(c)(5)(B); *Albemarle*, 821 F.3d 1345 (decided in 2016). CME had the same opportunity as any other party to place factual information on the record until 30 days before Commerce issued the preliminary determination. *See* 19 C.F.R. § 351.301(c)(3)(ii). Further, CME could have requested the opportunity to place such information on the record at a later point during the administrative review – for example, after Defendant-Intervenors submitted pre-preliminary comments arguing for Commerce to use the expected method to assign a rate to non-selected respondents – but did not do so. Commerce applied the expected method consistent with its longstanding practice and in the absence of any

record evidence suggesting the rate it yielded was unreasonably reflective of the non-selected

companies' dumping margins, and CME's argument should thus be rejected.

## IV.    The Rate Commerce Applied Pursuant to the Expected Method Was Reasonable

Finally, CME contends that pulling forward the all-others rate from the investigation is a

reasonable method to determine the rate for the non-selected respondents in the 2021-2022

administrative review. *See* CME's Mot. at 18-20.  However, CME presents no compelling reason

Commerce should have carried forward a rate from a prior segment of this proceeding, with no

factual or statutory relevance to the dumping activity of non-selected respondents during the

period of review, rather than apply the expected method.

In assigning the margins determined pursuant to facts available it is statutorily

permissible for Commerce to look "backward" in the proceeding to select the higher of: (1) the

highest corroborated rate from the petition; or (2) the highest calculated rate for *any respondent*

from *any segment* of the proceeding. *See* 19 U.S.C. § 1677d(c).  However, there is no statutory

basis to do so for non-selected respondents absent record evidence demonstrating that the

expected method yields a rate not reasonably reflective of the dumping margin of non-selected

respondents.  As the Federal Circuit in *Albemarle* has explained, carrying forward a rate from a

prior review for a non-selected company is unreasonable. *Albemarle*, 821 F.3d at 1355-56.  After

all, "{t}he purpose of periodic administrative reviews is to reassess dumping margins previously

calculated in light of data made available during the intervening period since the antidumping

order was issued." *Id.* at 1356.  Commerce correctly and reasonably determined that it did "not

find evidence that the overall market has not changed since the 2007-2008 POR such that pulling

forward the rate from that review would overcome the preference for contemporaneity." *Final*

*Results* IDM at 14.

Furthermore, in *PrimeSource*, the Federal Circuit saw "no need to evaluate" the appellants' argument that pulling forward rates from earlier administrative reviews would have been a more reasonable method for calculating a dumping margin for the non-selected respondents. *See PrimeSource*, 111 F.4th at 1335.  In dismissing the argument, the Federal Circuit reiterated that "{w}hen all mandatory respondents receive a rate that is zero, *de minimis*, or based entirely on AFA rates, Commerce's statutory obligation is to select '*any* reasonable method,' not the most reasonable method." *Id*. (citing 19 U.S.C. § 1673d(c)(5)(B)) (emphasis in the original).

CME cannot point to any evidence on the administrative record from the 2021-2022 administrative review that would justify application of the all-others rate from the 2007-2008 administrative review – or, indeed, *any* rate other than that assigned through application of the expected method.  Commerce's determination to employ that method, and not pull forward a rate from a previous segment with no apparent tie to current dumping activity, is reasonable and consistent with law.

## CONCLUSION

For these reasons, Commerce's *Final Results* are supported by substantial evidence and in accordance with law.  We respectfully request that this Court deny CME's motion for judgment on the agency record, sustain the *Final Results* in their entirety, and enter judgment in favor of the United States.

Respectfully submitted,

*/s/ William H Jones Jr*
William H Jones Jr
**VanAntwerp Attorneys, LLP**
1544 Winchester Ave. 5th Fl
PO Box 1111 Ashland,
KY 41105-1111

Phone: 606-329-2929
Email: wjones@vanattys.com
*Counsel for North American Stainless*


/s/ *Lydia C. Pardini*
Deanna Tanner Okun
Lydia C. Pardini
Alissa Chase
Joonho Hwang
**Polsinelli PC**
1401 I St NW, Washington, DC 20005
Telephone: (202) 783-3300
*Counsel for Outokumpu Stainless USA LLC*

18

## <u>CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)</u>

The undersigned hereby certifies that the foregoing brief contains 5,107 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

Date: November 26, 2024

/s/ *William H Jones Jr.*
William H Jones Jr
**VanAntwerp Attorneys, LLP**
1544 Winchester Ave. 5th Fl
PO Box 1111 Ashland,
KY 41105-1111
Phone: 606-329-2929
Email: wjones@vanattys.com
*Counsel for North American Stainless*

/s/ *Lydia C. Pardini*
Deanna Tanner Okun
Lydia C. Pardini
Alissa Chase
Joonho Hwang
**Polsinelli PC**
1401 I St NW, Washington, DC 20005
Telephone: (202) 783-3300
*Counsel for Outokumpu Stainless USA LLC*

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| CME Acquisitions, LLC<br><br>            Plaintiff<br><br>          **v.**<br><br>United States,<br><br>            Defendant,<br><br>   and<br><br>North American Stainless and Outokumpu<br>Stainless USA, LLC,<br><br>            Defendant-Intervenors. | Court No. 1:24-cv-00032 |

**PROPOSED JUDGMENT**

Before the Court are the complaint and United States Court of International Trade Rule 56.2 motion filed in this matter challenging the final result of the United States Department of Commerce regarding *Stainless Steel Sheet and Strip in Coils From Taiwan*, 89 Fed. Reg. 902 (Dep't Commerce Jan. 8, 2024) (final results of 2021-2022 administrative review) ("*Final Results*"), and accompanying issues and decision memorandum.

It is hereby **ORDERED, ADJUDGED,** and **DECREED** that the *Final Results* by Commerce are **SUSTAINED.**

                                           _____
                                            Judge Gary S. Katzmann

Dated: _____, 2024
      New York, New York