# THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE

———————————————————————————
)
CME ACQUISITIONS, LLC,                          )
)
              Plaintiff,          )
)
      v.                                  )     Court No. 24-00032
)
UNITED STATES,                                  )
)
            Defendant,         )
)
     and                                 )
)
OUTOKUMPU STAINLESS USA, LLC and                )
NORTH AMERICAN STAINLESS,                        )
)
       Defendant-Intervenors.      )
———————————————————————————

## ORDER

Upon consideration of plaintiff's motion for judgment upon the agency record, responses thereto, replies, the administrative record, and all other pertinent papers, it is hereby:

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the Department of Commerce's final results are sustained in their entirety.


Dated: _____, 2024          _____

     New York, NY                         GARY S. KATZMANN, JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| CME ACQUISITIONS, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>OUTOKUMPU STAINLES USA, LLC and NORTH AMERICAN STAINLESS, )<br><br>Defendant-Intervenors. ) | Court No. 24-00032 |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

OF COUNSEL:

JACK DUNKELMAN
Attorney
Department of Commerce
Office of the Chief Counsel
for Enforcement and Compliance
U.S. Department of Commerce

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

RAVI D. SOOPRAMANIEN
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0856
Fax: (202) 307-0972
Email: Ravi.Soopramanien@usdoj.gov

November 26, 2024                    *Attorneys for Defendant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................ ii

DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR
JUDGMENT UPON THE AGENCY RECORD .......................................................... 1

STATEMENT PURSUANT TO RULE 56.2 ......................................................................... 2

    I.     Administrative Determination Under Review ....................................................... 2

    II.    Issue Presented For Review ...................................................................................... 2

STATEMENT OF FACTS ....................................................................................................... 2

SUMMARY OF THE ARGUMENT .................................................................................... 6

ARGUMENT ............................................................................................................................. 7

    I.     Standard Of Review .................................................................................................... 7

    II.    Commerce's Use Of The Expected Method Was Lawful And Supported By
        Substantial Evidence .................................................................................................. 7

        A.    Applicable Legal Framework ................................................................ 7

        B.    Commerce's Use Of The Expected Method Was Lawful .......................... 9

        C.    Substantial Evidence Does Not Support A Finding That The Potential
            Dumping Of The Non-Selected Respondents Differed From The
            Dumping Of The Mandatory Respondents ............................................... 14

        D.    Commerce Did Not Depart From Any Established Practice ................... 19

CONCLUSION ....................................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*Albermarle Corp. & Subsidiaries v. United States,*
821 F.3d 1345 (Fed. Cir. 2016) .......................................................... *passim*

*Allegheny Ludlum Corp. v. United States,*
112 F. Supp. 2d 1141 (Ct Int'l Trade 2000) ................................... 20-21

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States,*
102 F.4th 1252 (Fed. Cir. 2024) ..................................................... 13, 14

*Atl. Sugar, Ltd. v. United States,*
744 F.2d 1556 (Fed. Cir. 1984) ............................................................ 7

*Baley v. United States,*
942 F.3d 1312 (Fed. Cir. 2019) .......................................................... 21

*Bowe-Passat v. United States,*
17 C.I.T. 335 (1993) ........................................................................... 22

*Cambria Company LLC v. United States,*
705 F. Supp. 3d 1369 (Ct. Int'l Trade 2024) ................................. 19, 20

*CBOCS West, Inc. v. Humphries,*
553 U.S. 442 (2008) ........................................................................... 14

*Changzhou Hawd Flooring Co. v. United States,*
848 F.3d 1006 (Fed. Cir. 2017) ................................................... *passim*

*Changzhou Wujin Fine Chem. Factory Co. v. United States,*
701 F.3d 1367 (Fed. Cir. 2012) ..................................................... 17, 18

*Consol. Edison Co. v. NLRB,*
305 U.S. 197 (1938) ............................................................................. 7

*Dickerson v. United States,*
530 U.S. 428 (2000) ........................................................................... 14

*Fujitsu Gen. Ltd. v. United States,*
88 F.3d 1034 (Fed. Cir. 1996) .............................................................. 7

*Government of Argentina v. United States,*
    542 F.Supp.3d 1380 (CIT 2021) ........................................................... 22

*Halliburton Co. v. Erica P. John Fund, Inc.,*
    573 U.S. 258 (2014) ........................................................................... 14

*Huvis Corp. v. United States,*
    570 F.3d 1347 (Fed. Cir. 2009) ........................................................... 20

*Loper Bright Enterprises v. Raimondo,*
    144 S. Ct. 2244 (June 28, 2024) ................................................... 13, 14

*Matsushita Elec. Indus. Co. v. United States,*
    750 F.2d 927 (Fed. Cir. 1984) ................................................................ 7

*NTN Bearing Corp. v. United States,*
    74 F.3d 1204 (Fed. Cir. 1995) .............................................................. 22

*PrimeSource Building Products, Inc. v. United States,*
    111 F.4th 1320 (Fed. Cir. 2024) ................................................... *passim*

*Rhone Poulenc, Inc. v. United States,*
    899 F.2d 1185 (Fed. Cir. 1990) ........................................................... 17

*United States v. Great Am. Ins. Co. of New York,*
    738 F.3d 1320 (Fed. Cir. 2013) ........................................................... 21

*United States v. Zannino,*
    895 F.2d 1 (1st Cir. 1990) .................................................................... 21

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) .............................................................................. 7

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,*
    716 F.3d 1370 (Fed. Cir. 2013) ................................................... *passim*

## STATUTES

19 U.S.C. § 1516(a)(b)(1)(B) ........................................................................ 7

19 U.S.C. § 1673(c)(5)(B) ............................................................................ 8

19 U.S.C. § 1673d(c)(5) ............................................................................... 7

19 U.S.C. § 1673d(c)(5)(A) ........................................................................ 7, 8

19 U.S.C. § 1673d(c)(5)(B) ........................................................................ *passim*

19 U.S.C. § 1677f-1(c)(2) ..................................................................... 8, 18, 20

19 U.S.C. § 1677f-1(c)(2)(B) ........................................................................ 19

## RULES

Rule 56.2 ................................................................................................... 1

## FEDERAL REGISTER NOTICES

*Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils from Taiwan*,
    64 Fed. Reg. 30,592 (June 8, 1999) ........................................................ 18

*Notice of Antidumping Duty Order; Stainless Steel Sheet and Strip in Coils From United Kingdom, Taiwan and South Korea*,
    64 Fed. Reg. 40,555 (July 27, 1999) (order) ............................................ 2

*Stainless Steel Sheet and Strip in Coils from Taiwan: Final Results and Rescission in Part of Antidumping Duty Administrative Review*,
    73 Fed. Reg. 6,932 (February 6, 2008) .................................................... 18

*Finished Carbon Steel Flanges From Italy: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*,
    84 Fed. Reg. 55,551 (October 17, 2019) ................................................. 20

*Finished Carbon Steel Flanges From Italy: Final Results of Antidumping Duty Administrative Review; 2017-2018*,
    85 Fed. Reg. 21,825 (April 20, 2020) ...................................................... 20

*Stainless Steel Flanges from India: Final Results of Antidumping Duty Administrative Review; 2018-2019*,
    86 Fed. Reg. 47,619 (August 26, 2021) ................................................... 20

*Certain Steel Nails from Taiwan: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020-21*,
    87 Fed. Reg. 35,734 (June 13, 2022) ....................................................... 20

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    87 Fed. Reg. 54,463 (September 6, 2022). ................................................ 2

*Certain Steel Nails from Taiwan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021,*
87 Fed. Reg. 63,034 (October 18, 2022) ................................................................. 20

*Certain Quartz Surface Products From India: Final Results of Antidumping Duty Administrative Review*; 2019-2021,
88 Fed. Reg. 1,188 (January 9, 2023) ...................................................................... 19

*Stainless Steel Sheet and Strip in Coils from Taiwan,*
88 Fed. Reg. 20,481 (April 6, 2023) .......................................................................... 3

*Stainless Steel Sheet and Strip in Coils from Taiwan,*
89 Fed. Reg. 902 (January 8, 2024) ........................................................................... 2

## LEGISLATIVE HISTORY

H.R. Rep. No. 103-316, vol. 1 (1994) (SAA), 1994 U.S.C.C.A.N. 4040). .......................... *passim*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE

_____
                                                              )
CME ACQUISITIONS, LLC,                      )
                                                              )
                            Plaintiff,              )
                                                              )
            v.                                           )          Court No. 24-00032
                                                              )
UNITED STATES,                                  )
                                                              )
                            Defendant,          )
                                                              )
            and                                         )
                                                              )
OUTOKUMPU STAINLESS USA, LLC and    )
NORTH AMERICAN STAINLESS,           )
                                                              )
                            Defendant-Intervenors.    )
_____)

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,

respectfully submits this response to the motion for judgment upon the agency record filed by

plaintiff, CME Acquisitions, LLC (CME), ECF No. 31 (Pl. Br.). Plaintiff challenges one aspect

of the U.S. Department of Commerce's final results in the eleventh administrative review of the

antidumping duty order covering stainless steel sheet and strip in coils from Taiwan. Because

the final results are supported by substantial evidence and otherwise in accordance with law, we

respectfully request that the Court reject plaintiff's challenge, sustain the final results, and enter

judgment in favor of the United States.

<u>**STATEMENT PURSUANT TO RULE 56.2**</u>

**I.**     <u>**Administrative Determination Under Review**</u>

The administrative determination under review is *Stainless Steel Sheet and Strip in Coils from Taiwan*, 89 Fed. Reg. 902 (Dep't of Commerce Jan. 8, 2024) (final results), P.R. 68, and the accompanying Issues and Decision Memorandum (IDM), P.R. 67. [1]  The period of review is July 1, 2021 through June 30, 2022 (POR).  *Id.*

**II.**     <u>**Issue Presented for Review**</u>

Whether Commerce's calculation of the non-selected rate for non-selected respondents, using the expected method, is supported by substantial evidence and otherwise in accordance with law.

<u>**STATEMENT OF FACTS**</u>

On July 27, 1999, Commerce published the antidumping duty order on stainless steel sheet and strip in coils from Taiwan.  *Notice of Antidumping Duty Order; Stainless Steel Sheet and Strip in Coils From United Kingdom, Taiwan and South Korea*, 64 Fed. Reg. 40,555 (Dep't of Commerce July 27, 1999) (order).  On September 6, 2022, Commerce initiated the eleventh administrative review of the order for the period of review of July 1, 2021 to June 30, 2022.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 54,463 (Dep't of Commerce Sept. 6, 2022) (initiation notice), P.R. 7.  Commerce selected Lien Kuo Metal Industries Co, Ltd (Lien Kuo) and S More Steele Materials Co., Ltd (S More) for individual examination as mandatory respondents to the administrative review, as these two

_____

[1] "P.R." refers to documents from the public record.  "C.R." refers to documents from the confidential record.

companies accounted for the largest volume of subject merchandise from Taiwan during the POR. *See* Respondent Selection Memorandum (Oct. 7, 2019), P.R. 16, C.R. 3.[2]

On October 19, 2022, Commerce issued its antidumping questionnaire to Lien Kuo and S More. *See* Lien Kuo Questionnaire, P.R. 18; S More Questionnaire, P.R. 19. On November 23, 2022, Lien Kuo and S More jointly filed a letter informing Commerce that neither company would be responding to Commerce's questionnaire. *See* Letter Pertaining to S-More and Lien Kuo Questionnaire Responses (Nov. 23, 2022), P.R. 32.

On April 6, 2023, Commerce published its preliminary results. *See Stainless Steel Sheet and Strip in Coils from Taiwan*, 88 Fed. Reg. 20,481 (Dep't of Commerce April 6, 2023) (preliminary results), P.R. 51, and the accompanying Preliminary Decision Memorandum (PDM), P.R. 49. Commerce preliminarily applied total adverse facts available (AFA) to Lien Kuo and S More as they both failed to respond to Commerce's questionnaire. PDM at 7-10. With regard to the rate assigned to companies not selected for individual examination (the "non-selected rate"), Commerce explained that when the dumping margins for all individually investigated companies are zero, *de minimis*, or based entirely on facts available (AFA rates), the "expected method" for determining the non-selected rate will be to weight-average the zero, *de minimis*, and AFA rates. *Id.* at 7 (citing 19 U.S.C. § 1673d(c)(5)(B); Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1 (1994) (SAA) at 873 as reprinted in 1994 U.S.C.C.A.N. 4040).

Where the expected method "is not feasible or results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers,

---

[2] No party argued that Commerce should select respondents for limited examination based on sampling. *Id.* Plaintiff's brief provides an overview of the rates applied to other companies selected as mandatory respondents in prior reviews of the order. *See* Pl. Br. at 3-6.

Commerce may use other reasonable methods." *See id.* at 7 (quoting SAA at 873). Commerce preliminarily found that the mandatory respondents' weighted-average dumping margins, of 21.10 percent, were not reasonably reflective of the potential dumping margins of non-selected companies because in the tenth administrative review for the period of review of July 1, 2008 to June 30, 2009, when Commerce last completed an administrative review of the order, the rate assigned to the sole mandatory respondent was 0.00 percent and the non-selected rate was 4.30 percent for non-selected respondents. *Id.* at 7.

Commerce thus determined to rely instead on another "reasonable method" for determining the non-selected rate whereby Commerce pulled forward a rate calculated in a prior segment of this antidumping proceeding without using zero or *de minimis* margins, or margins based entirely on AFA.[3] *Id.* (explaining that when the dumping margins for all individually investigated companies are zero, *de minimis*, or based on facts available, if the expected method is not reasonably reflective of potential dumping margins for the non-investigated companies, Commerce may use other reasonable methods to calculate the non-selected rate) (citing section 19 U.S.C. 1673d(c)(5)(B); SAA at 873; *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1352 (Fed. Cir. 2016)). Commerce preliminarily assigned a non-selected rate of 4.30 percent to the non-selected companies, which was the non-selected rate calculated and assigned in the tenth administrative review of the order. *Id.*

On May 8, 2023, North American Stainless and Outokumpu Steel USA LLC (collectively, domestic interested parties), submitted a case brief advocating for Commerce to apply the expected method in its final results to average, then assign the non-selected rate of

---

[3] We refer to the underlying investigation and prior administrative reviews of the order in shorthand as "prior segments of this proceeding," as plaintiff does in its brief. *See*, *e.g.*, Pl. Br. at 1.

21.10 percent to the non-selected companies, reflecting the rates that were assigned to mandatory respondents. *See* Domestic Interested Parties' Case Brief, P.R. 52. On May 15, 2023, CME submitted a rebuttal brief asserting that Commerce should continue to assign the 4.30 rate used in the tenth administrative review to non-selected companies. CME Rebuttal Brief, P.R. 57.

Commerce published its final results on January 8, 2024. *See* Final Results, 89 Fed. Reg 902, P.R. 68, and accompanying IDM, P.R. 67. In its final results, Commerce applied the expected method in calculating the non-selected rate, through which Commerce averaged the total AFA rates determined for the two individually examined respondents.[4] Commerce determined that the expected method was lawful and appropriate, considering the record as a whole and the history of rates assigned in prior segments concerning the order. IDM at 8-15. Commerce explained that the expected method is the default method for determining the rate of non-selected respondents when all rates are zero, *de minimis*, or based entirely on facts available. IDM at 9-10. Commerce further explained that after reassessing the facts of the case, the arguments of interested parties, and the applicable legal framework, Commerce found that no substantial evidence on the record indicated that the non-examined companies' dumping was different from that of the mandatory respondents, or that the mandatory respondents were otherwise not representative of the market. IDM at 15. In particular, Commerce rejected CME's contention that the non-selected rate calculated for a review conducted over a decade ago was somehow more reasonably reflective of the non-selected companies' potential dumping margins. IDM at 14. Consequently, Commerce determined an average antidumping duty rate of 21.10

---

[4] In the IDM, Commerce stated that it was calculating a simple average of the mandatory respondents' rates. While the expected method contemplates weight-averaging, *see PrimeSource*, 111 F.4th at 1330-31, that distinction is immaterial here because the rates for both mandatory respondents were identical. As such, simple averaging and weight averaging would have yielded the same result, as we discuss in more detail below.

percent for non-individually examined respondents.  89 Fed. Reg. 903 (Jan. 8, 2024).  This

lawsuit followed.  *See* Summons, ECF No. 1 (filed on February 2, 2024).

## SUMMARY OF THE ARGUMENT

Commerce's determination to apply the expected method to determine the non-selected

rate for non-selected respondents is lawful and supported by substantial evidence.  The SAA

explicitly anticipates that Commerce will weight-average zero, *de minimis*, and AFA rates to

discern the non-selected rate when no calculated rate above *de minimis* exists for a mandatory

respondent in the current segment of the proceeding.  Indeed, the SAA refers to this as the

"expected method."  SAA at 873.

Moreover, the U.S. Court of Appeals for the Federal Circuit has affirmed Commerce's

application of the expected method in multiple cases.  These cases generally indicate that the

Federal Circuit will not disturb Commerce's determination that the rates for mandatory

respondents should be considered representative of the potential dumping margins of non-

selected respondents, unless substantial evidence demonstrates otherwise. *See PrimeSource* 111

F.4th 1320, 1331-32 (Fed. Cir. 2024); *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d

1006, 1012 (Fed. Cir. 2017); *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345,

1353 (Fed. Cir. 2016).  Commerce's application of the expected rate method to determine the

rate for non-individually examined respondents in the proceeding at issue in this case, which

followed the directive of the SAA and Federal Circuit precedent, was reasonable and lawful.

Commerce also reasonably determined that substantial evidence did not establish that the

rates for the mandatory respondents were not reflective of the rates for the non-selected

respondents.  Plaintiff cannot overcome this deficiency by claiming that it was "sandbagged" by

Commerce's decision to apply the default methodology contemplated by statute and affirmed repeatedly by the Federal Circuit. Accordingly, Commerce's final results should be sustained.

**ARGUMENT**

### I.     Standard Of Review

In reviewing Commerce's antidumping determinations, this Court sustains "'any determination, finding, or conclusion found' by Commerce unless it is 'unsupported by substantial evidence upon the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (citing 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" is "more than a mere scintilla" of relevant and reasonable evidence, *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *see also Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (cleaned up).

### II.    Commerce's Use Of The Expected Method Was Lawful And Supported By Substantial Evidence

#### A.    Applicable Legal Framework

The governing statute is silent on the calculation method of the non-selected rate in administrative reviews. Accordingly, in an administrative review, Commerce, in calculating that rate, is guided by 19 U.S.C. § 1673d(c)(5), which provides instructions for calculating the non-selected rate in an investigation (termed an "all-others rate"). Pursuant to subsection 1673d(c)(5)(A), Commerce calculates the all-others rate by taking a weighted average of

dumping margins assigned to the individually investigated companies (*i.e.*, mandatory respondents), excluding those margins that are zero, *de minimis*, or determined entirely on the basis of AFA. *See* 19 U.S.C. § 1673d(c)(5)(A).

Where dumping margins for all individually investigated companies are zero, *de minimis*, or determined based entirely on AFA, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for exporters and producers individually investigated." 19 U.S.C. § 1673(c)(5)(B). The SAA directs that, when the dumping margin for all of the exporters and producers that are individually investigated are determined entirely on the basis of facts available or are zero or *de minimis*, "{t}he expected method in such cases will be to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." SAA at 873.

The Federal Circuit has upheld Commerce's application of the expected method in the context of administrative reviews, explaining that the general assumption underlying the statutory framework is that "the individually examined respondents account for a majority of the market during the relevant period, and are representative at the very least in terms of aggregate volume." *Albemarle*, 821 F. 3d at 1353; *see also* 19 U.S.C. 1677f-1(c)(2) (allowing Commerce to limit its examination exporters or producers, which accounts for the largest volume of subject merchandise that can be reasonably examined, when it is not practicable for Commerce to examine each company individually). "The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." *Albemarle*, 821 F.3d at 1353; *see also Changzhou Hawd*, 848 F.3d at 1012 ("Thus, the mandatory respondents in this matter are assumed to be

representative.").  Moreover, "{t}he statute assumes that, absent such evidence, reviewing only a

limited number of exporters will enable Commerce to reasonably approximate the margins of all

known exporters."  *Albemarle*, 821 F.3d at 1353.

The Federal Circuit has further explained that "the expected method is the default

method" and in order to divert from the expected method, substantial evidence must demonstrate

that the non-examined companies' dumping behavior would be different than that of the

mandatory respondents.  *Id.*; *see PrimeSource*, 111 F.4th at 1330 ("{W}hen Commerce applies

the expected method, the party that desires Commerce to deviate from the expected method bears

the burden to identify and present substantial evidence on the record that either the expected

method was 'not feasible' or produced results not 'reasonably reflective of potential dumping

margins for non-investigated exporters or producers.'"); *see also Changzhou Hawd*, 848 F. 3d at

1012 ("Under *Albemarle*, Commerce could not deviate from the expected method unless it

found, based on substantial evidence, that the separate rate firms' dumping is different from that

of the mandatory respondents.").

### B.  Commerce's Use Of The Expected Method Was Lawful

As summarized above, the rates Commerce determined for both individually examined

respondents here were based entirely on AFA.  Therefore, consistent with the SAA and Federal

Circuit precedent, Commerce applied the expected method and calculated a margin for the non-

selected respondents by averaging the rates assigned to the individually examined respondents.

That is, Commerce averaged the mandatory respondents' rates of 21.10 percent, with the result

that the non-selected respondents also received a rate of 21.10 percent.  *See* IDM at 8.[5]

---

[5] Plaintiff refers to Commerce applying an AFA rate to "all others" companies.  Pl. Br. at
18.  To be clear, Commerce did not "apply" an AFA rate to non-selected companies.  Rather,
Commerce calculated the non-selected rate for non-selected companies by averaging the rates
assigned to mandatory respondents, which were both based on AFA.

CME acknowledges that the Federal Circuit recently sustained a similar methodology in *PrimeSource*, 111 F.4th at 1326, where Commerce had weight-averaged the two identical AFA rates of both mandatory respondents to calculate the non-selected rate. Pl. Br. at 13. In sustaining this methodology, the Federal Circuit explained that the expected method is the "default methodology" under the statute and the "burden is on Commerce to justify a departure from the expected method, not to justify its use." *PrimeSource*, 111 F.4th at 1329-30. The Federal Circuit found that this burden is not discharged simply because, in contrast to the mandatory respondents that received AFA rates, the non-selected respondents at issue cooperated; rather, the mandatory respondents are presumed to be representative of non-selected respondents absent substantial evidence to the contrary. *Id.* at 1330-32. Having initially recognized the significance of this case, which reached disposition at the Federal Circuit during the briefing of these proceedings,[6] CME now asks the Court to disregard it because Commerce applied a simple average here, which makes this case more like *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) (*Bestpak*), and the Federal Circuit in *PrimeSource* "appears to have relied on Commerce's construction of the statutory language" rather than its own independent construction. These arguments are misplaced.

As an initial matter, CME erroneously argues that the Federal Circuit's decision in *Bestpak* controls the outcome of this case. In *Bestpak*, the Federal Circuit held that the simple average of a *de minimis* rate and a China-wide entity rate calculated using AFA was not reasonably reflective of the potential dumping margins for separate rate respondents that had established their independence from the Government of China. Pl. Br. at 2, 13-14. CME asserts

---

[6] On August 9, 2024, CME filed a consent motion seeking additional time to file its opening brief in order to examine the Federal Circuit's ruling in *PrimeSource*, ECF No. 29, which the Court granted that same day, ECF No. 30.

that the instant case is similar to *Bestpak* because in the administrative review at issue here, Commerce used a simple average to calculate the non-selected respondent rate, which the Federal Circuit recognized in *PrimeSource* is not the expected method. Pl. Br. at 15.

This comparison is flawed. We acknowledge that in the final results at issue here, Commerce did state that it calculated the non-selected rate using a simple average of the mandatory respondents' rates. However, unlike in *Bestpak*, Commerce assigned an identical AFA rate of 21.10 percent to both mandatory respondents. When identical rates are assigned, the weighted average of those rates, by mathematical necessity, is equivalent to their simple average. Because both rates are identical, calculating the non-selected rate by taking a simple average of these two rates results yields precisely the same outcome as a weighted average – 21.10 percent, satisfying the expected method's requirement of a weighted average in form and function. *Bestpak*, in contrast, involved two different rates (a *de minimis rate* and an AFA rate of 247.65 percent), such that a simple average and weighted average would not have necessarily yielded the same average rate. *Bestpak*, 716 F.3d at 1375. Plaintiff's argument thus elevates form over substance.

Moreover, *Bestpak* does not in any event support plaintiff's contention that Commerce's application of the expected method must be supported by substantial evidence. While it is true that the Federal Circuit in *Bestpak* found the use of *de minimis* and AFA rates to calculate a separate rate "questionable in terms of economic reality," there was no question that Commerce's determination to apply a simple average of these rates "me[t] the statute's lenient standard of 'any reasonable method.'" *Bestpak*, 716 F.3d at 1378. The Federal Circuit, accordingly, did not find that averaging *de minimis* and AFA rates is *per se* impermissible, as Bestpak argued. It opined instead that "{19 U.S.C.} § 1673d(c)(5)(B) and the SAA explicitly

allow Commerce to factor both de minimis and AFA rates into the calculation methodology." *Id.*
*Bestpak* does not, accordingly, discharge plaintiff from meeting its evidentiary burden here.

Plaintiff is also incorrect in its assertion that Commerce's decision in this case contravenes the "controlling principles" of "fairness" and "accuracy" set forth in *Bestpak*. *See* Pl. Br. at 15-16, 18. Principles of fairness and accuracy do not override the statute, and Commerce complied with the statute in this case. As the Federal Circuit explained in *PrimeSource*, "{n}either the statute nor the SAA distinguishes scenarios where the examined respondents all received a zero, *de minimis*, or AFA rate, or some combination of the three." 111 F.4th at 1329. In either scenario, "the expected method is just that—expected—even when all respondents receive an AFA rate." *Id.* (citing *Albemarle*, 821 F.3d at 1352). Therefore, as Commerce stated in its final results, "{w}hile *Albemarle* contemplated *de minimis* rates, and this review contemplates the inclusion of rates based entirely on facts available, the congressionally approved 'expected method' allows for zero and *de minimis* rates and rates based entirely on facts available, with no preference for one type of rate over another." IDM at 10.

Moreover, the Federal Circuit clarified in *PrimeSource* that *Bestpak* does not address Commerce's evidentiary burden when using the expected method to calculate the non-selected rate. *PrimeSource*, 111 F.4th at 1331. Because, as explained above, Commerce used the expected method in this case, the Federal Circuit's holding in *Bestpak* does not inform the Court's review. Indeed, as set forth below, Commerce met the requirements of *PrimeSource* when it considered the issue of whether the mandatory respondents' rates were reflective, and reasonably determined that the record did not contain substantial evidence that the mandatory respondents' dumping differed from that of the non-selected respondents.

CME's contention that the Federal Circuit in *PrimeSource*, in purportedly deferring to Commerce's construction of the statutory language, thereby abdicated on its "solemn duty … to interpret statutes and 'say what the law is'" is speculative, at best. Pl. Br. at 14. A plain reading of *PrimeSource* reveals no such deferral to Commerce's construction. Rather, the Federal Circuit found that plaintiff PrimeSource had failed to discharge its burden of "identify[ing] and present[ing] substantial evidence on the record that either the expected method was 'not feasible' or produced results not 'reasonably reflective of potential dumping margins for non-investigated exporters or producers.'" *PrimeSource*, 111 F.4th at 1329. In so doing, the Federal Circuit did not evince any intention of deferring to Commerce on statutory construction.

The Court should also reject plaintiff's veiled attempt to use *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (June 28, 2024) to sidestep the binding precedent of *PrimeSource*. Pl. Br. at 14. As an initial matter, the Federal Circuit's decision in *PrimeSource* postdates *Loper Bright* – as such, the Federal Circuit did not apply *Chevron* deference in that case. Instead, the Court analyzed the statute and the SAA, which is legislative history that Congress has mandated "as an authoritative expression concerning the interpretation and application of the Tariff Act," and ultimately agreed with Commerce's interpretation of the statute and affirmed Commerce's decision. *See PrimeSource*, 111 F.4th at 1325 (citing *Bestpak*, 716 F.3d at 1373; 19 U.S.C. § 3512(d)). There is nothing in *Loper Bright* that precludes the Federal Circuit from agreeing with an agency's interpretation of the statute, as CME appears to suggest.[7]

---

[7] Indeed, the statute simply requires a method that is "reasonable" and the SAA provides additional context for what might be reasonable in particular circumstances. The Federal Circuit recognized in *Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259 (Fed. Cir. 2024) (*ASEMESA*) that certain statutory terms are "general in nature, indicating that Congress intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce." If a term is "general but not ambiguous," a case is "more properly viewed as one involving implied delegation of adjudicative authority to

Further, even if the Federal Circuit had applied *Chevron* in *PrimeSource*, these proceedings would not present the Court with a case of true statutory ambiguity; rather, this is a case where the plain terms of the statute give Commerce considerable discretion to employ a simple averaging methodology. *See ASEMESA*, 102 F.4th at 1259-1261.

Moreover, to the extent that *Prime Source* relied on other cases that cited *Chevron*, those cases remain good law:

> {H}owever, we do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful {. . .} are still subject to statutory *stare decisis* despite our change in interpretive methodology. Mere reliance on *Chevron* cannot constitute a "special justification" for overruling such a holding, because to say a precedent relied on *Chevron* is, at best, just an argument that the precedent was wrongly decided. That is not enough to justify overruling a statutory precedent.

*Loper Bright* at 2273 (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 456 (2008); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014); *Dickerson v. United States*, 530 U.S. 428, 443 (2000)). Thus, precedent sustaining Commerce's interpretation of the antidumping duty statutes remains in effect under the principle of *stare decisis*.

### C. Substantial Evidence Does Not Support A Finding That The Potential Dumping Of the Non-Selected Respondents Differed From the Dumping Of The Mandatory Respondents

To deviate from the expected method, Commerce "must affirmatively determine, based on substantial evidence, that the expected method is not feasible or would not be reasonably reflective of the potential dumping margin of the non-selected respondents." *See PrimeSource*, 111 F.4th at 1330. Commerce's determination in this case, that the record did not contain

---

the agency rather than deference to the agency's interpretation of an ambiguous statute." *Id.* at 1261. Because the statute impliedly delegates discretion to Commerce in selecting a method that is reasonable under the circumstances, Commerce "is authorized to exercise a degree of discretion" in giving meaning to these terms, and the Court's review is limited to "ensuring the agency has engaged in reasoned decisionmaking." *See Loper Bright*, 144 S. Ct. at 2263.

substantial evidence that the mandatory respondents' dumping margins were non-reflective of those of the non-selected respondents, was reasonable and supported by substantial evidence.

Plaintiff asserts that an application of an AFA rate to non-selected respondents must be supported by sufficient record evidence that the non-selected rate is reflective of the non-selected respondents' dumping margins. Pl. Br. at 18. However, this argument flips the Federal Circuit's guidance. In *Albemarle*, the Federal Circuit recognized a *presumption* in favor of the representativeness of the mandatory respondents that could only be overcome with "substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different." *Albemarle*, 821. F.3d at 1353; *see also Changzhou Hawd* (emphasizing that "[t]he very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." (quoting *Albemarle*, 821 F.3d at 1353). In *PrimeSource*, the Federal Circuit affirmed Commerce's use of the expected method in similar circumstances, applying the expected method to average two identical AFA rates from mandatory respondents, resulting in an equivalent non-selected rate. *PrimeSource*, 111 F.4th at 1326, 1334-1335. The Federal Circuit held that "when Commerce applies the expected method, the party that desires Commerce to deviate from the expected method bears the burden to identify and present substantial evidence on the record that either the expected method was 'not feasible' or produced results not 'reasonably reflective of potential dumping margins for non-investigated exporters or producers.'" *Id.* at 1330.

Plaintiff fails to show that the expected method was not feasible or that the average of the AFA rates assigned to the mandatory respondents is not representative of non-examined companies. Rather, plaintiff effectively concedes in its brief that it did not meet its burden to justify deviation from the expected method. Pl. Br. at 10 ("CME reasonably believed that it had

no reason to 'rebut {Commerce's} presumption that the margins assigned to the mandatory respondents are representative of the non-selected companies.'").

Rather than proffering positive evidence to support its claim that the 21.10 percent AFA rate does not bear a relationship to the non-selected respondents' margins, plaintiff summarizes Commerce's determinations in prior segments of this antidumping proceeding in order to frame Commerce's application of the expected method in its final results as analogous to a departure from established prior practice. In particular, plaintiff points to prior reviews where the margins for cooperative respondents ranged from zero to 4.30 percent to suggest that the mandatory respondents' AFA rates in this review are atypical, and thus, unreasonable to apply to the non-selected companies. Pl. Br. at 17-18. However, prior to the POR of the administrative review at issue here, the most recent non-selected rate, of 4.30 percent, was calculated over a decade ago, during the tenth administrative review of the order. IDM at 13. That rate, in turn, was pulled forward from the ninth administrative review of the order, covering the period of review of July 1, 2007 to June 30, 2008, during which the 4.30 rate was first calculated. *Id.* In the absence of evidence to the contrary, Commerce determined that such rates could not reasonably provide insight into potential dumping margins of respondents during the POR of the twenty-fourth administrative review of the order. IDM at 14 (citing *Albemarle*, 831 F.3d at 1357) ("it is not open to Commerce to argue that prior review data is reliable simply because it is 'temporally proximate.'").

Plaintiff avers that the AFA rate calculated for the mandatory respondents is not representative of cooperative, non-examined companies, yet offers little to substantiate this claim beyond its misplaced reliance on *Bestpak*. Pl. Br. at 18. In so doing, plaintiff ignores the Federal Circuit's prior explanations that the AFA rate "reflects a common sense inference that the

highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced current information showing the margin to be less." *PrimeSource*, 111 F.4th at 1332 (quoting *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990)). As the Federal Circuit recognized in *PrimeSource*, the failure of mandatory respondents to provide questionnaire response constitutes circumstantial, contemporaneous evidence that their dumping margin was equal to or higher than the AFA rate during the relevant POR. *See PrimeSource*, 111 F.4th at 1333.

Additionally, as the Federal Circuit has repeatedly explained, mandatory respondents – whether they receive rates that are zero, *de minimis*, or based entirely on facts available – are presumed to be representative of non-selected respondents. *See id.* at 1331-32. Accordingly, CME cannot undermine the presumption of representativeness of the mandatory respondents with a simple assertion that all mandatory respondents received an AFA rate. *Id.* at 1332 ("The mere fact that all mandatory respondents received an AFA rate cannot, in and of itself, undermine the presumption of representativeness.").

For similar reasons, plaintiff's reliance on *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1378-79 (Fed. Cir. 2012) is unavailing. Citing *Changzhou Wujin*, CME argues that rates based on adverse inferences are "disfavored under the statute." Pl. Br. at 17. However, the Federal Circuit did not deem the expected method unlawful in that decision. Rather, it concluded that Commerce failed to provide an adequate rationale for constructing a hypothetical AFA rate and subsequently averaging it with a calculated *de minimis* rate to derive and assign a separate rate. *Changzhou Wujin*, 701 F.3d at 1375-77 ("The hypothetical AFA rate Commerce generated on remand was an 'AFA rate' in name only: its sole purpose was to serve

17

as a value in the recalculation of the separate rate. The hypothetical AFA rate was not assigned to any individually investigated entity, and only affected cooperating respondents.").

In the instant review, Commerce did not utilize a hypothetical rate. Rather, Commerce incorporated a rate that had been assigned and corroborated as an AFA rate in the underlying investigations.[8] Indeed, the Federal Circuit in *Changzhou Wujin* specifically distinguished the hypothetical AFA rate from AFA rates actually assigned to mandatory respondents. *See id*. at 1378-79. While the Court stated that 19 U.S.C. 1673d(c)(5)(B) suggests the possibility of other valid approaches to select the rates for non-selected respondents, here, the expected method was reasonable given the lack of record evidence to rebut its use.

Lastly, the Court should dispense with plaintiff's argument that the fact that U.S. Customs and Border Protection (CBP) data showed entries for only three companies, despite the review covering 61 companies, somehow undermines Commerce's conclusion that the mandatory respondents are representative of non-selected companies. Pl. Br. at 19. When Commerce limits respondent selection to a reasonable number of companies pursuant to 19 U.S.C. § 1677f-1(c)(2), as it did here, Commerce's practice is to rely on CBP entry data for each company for which review was requested to select respondents accounting for the largest volume of subject imports that can be reasonably examined, consistent with section 19 U.S.C. § 1677f-1(c)(2)(B). Here, Commerce followed its practice and released data for "all entries of stainless steel sheet and strip in coils from Taiwan during the period July 1, 2021, through June 30, 2022,

---

[8] "In this review, we are not including a hypothetical rate in our calculation of the rate assigned to the non-selected respondents; we are including a rate assigned and corroborated as an AFA rate in the investigation." IDM at 11. *See Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils from Taiwan*, 64 Fed. Reg. at 30,599-30,600 (June 8, 1999) (discussing corroboration of the 21.10 percent AFA rate); *see also Stainless Steel Sheet and Strip in Coils from Taiwan 2005-06 Final*, 73 Fed. Reg. 6,932, 6,935 (Febuary 6, 2008) (assigning the 21.10 percent AFA rate to mandatory respondents).

*for companies for which a review was requested*." *See* CBP Data Release Memo (Sept. 7, 2022); P.R. 6, C.R. 1 (emphasis added). From these data, Commerce selected the two largest exporters for individual examination. *See* Respondent Selection Memorandum. Again, the statute assumes that the largest exporters are representative of non-selected respondents. *See PrimeSource* 111 F.4th at 1332 ("the respondent selection process under 19 U.S.C. 1677f-1(c)(2) supports the presumption of the representativeness based on the exporters' volume . . . .) (citing *Albemarle*, 831 F.3d at 1353 ("The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters.); *Changzhou Hawd*, 848 F.3d at 1021)).

### D. **Commerce Did Not Depart From Any Established Practice**

Plaintiff claims that Commerce's application of the expected method in this case "constitutes a stark departure" from its prior practice and avers that it was "sandbagged by Commerce's change of position." *See* Pl. Br. at 18-20. In support of this prior practice, CME cites Commerce's determination in *Certain Quartz Surface Products From India: Final Results of Antidumping Duty Administrative Review*; 2019-2021, 88 Fed. Reg. 1188 (Dep't of Commerce Jan. 9, 2023), and accompanying IDM at Comment 5, where Commerce pulled forward a non-selected rate from the previous segment of that proceeding, namely the final phase investigation, on the basis that the calculated rates in the investigation were significantly lower than the AFA rate of 162.53 percent determined in the first administrative review of the underlying order.

Plaintiff, however, fails to acknowledge that the final results of the 2019-2021 review of the antidumping order on Certain Quartz Surface Products From India were subsequently challenged before the Court, which held that, in pulling forward the non-selected rate from the investigation, Commerce had failed to support its departure from the expected method. *See*

*Cambria Company LLC v. United States*, 705 F. Supp. 3d 1369, 1384 (Ct. Int'l Trade 2024). In so holding, the Court invoked the Federal Circuit's decision in *Albemarle*, which indicated that using data from a prior period may be reasonable when "there is evidence that the overall market and the dumping margins have not changed from period to period." *Id.* (citing *Albemarle*, 821 F.3d at 1357. The Court held that Commerce, in comparing rates from two successive periods of review without explaining why the earlier segment was more probative than the later segment, had failed to identify "substantial evidence to establish that any one segment is more representative than a single other segment." *Cambria*, 705 F. Supp. at 1384.

In any event, Commerce does not—as plaintiff asserts—have an established practice of pulling forward rates where all mandatory respondents receive margins based on total AFA. To the contrary, Commerce often applies the expected method where all individually examined respondents received rates based on total AFA.[9] Insofar as Commerce had any contrary "practice," *arguendo*, it is free to depart from that practice where it provides a reasonable explanation for doing so. *See, e.g.*, *Huvis Corp. v. United States*, 570 F.3d 1347, 1354 (Fed. Cir. 2009); *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1148 (Ct Int'l Trade

---

[9] *See Certain Steel Nails from Taiwan: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020-21*, 87 Fed. Reg. 35,734 (June 13, 2022) (*Nails from Taiwan 2020-21 Prelim*) (applying a rate based on a simple average of two identical AFA rates to the companies not selected for individual examination), unchanged in *Certain Steel Nails from Taiwan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 87 Fed. Reg. 63,034 (October 18, 2022) (*Nails from Taiwan 2020-21 Final*); *Finished Carbon Steel Flanges From Italy: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 Fed. Reg. 55,551 (October 17, 2019), and accompanying Preliminary Decision Memorandum (assigning the non-selected companies a rate based on a simple average of the identical AFA rates assigned to the two mandatory respondents), unchanged in *Finished Carbon Steel Flanges From Italy: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 21,825 (April 20, 2020); *Stainless Steel Flanges from India: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 47,619, 47,620 (August 26, 2021) (*Flanges from India*).

2000) (explaining that "an agency must either conform itself to its prior decisions or explain the reasons for its departure."). Here, Commerce provided such an explanation by explaining that its methodology comported with the statute and guidance from the Federal Circuit.

Citing Commerce's past "practice" in prior segments of the antidumping proceeding at issue here, plaintiff complains that it had no reason to believe that it needed to place additional information on the record to show that the AFA rates of the mandatory respondents did not reflect plaintiff's dumping margin. Pl. Br. at 20. According to plaintiff, Commerce was required to "advis[e] interested parties of the need to submit such evidence." *See id.*[10]

But the Federal Circuit has held it is not Commerce's responsibility to advise parties in antidumping duty proceedings. *See PrimeSource*, 111 F.4th at 1330 (explaining that the burden of proof rests on the party seeking to depart from the expected method). Moreover, plaintiff is incorrect that it had no "notice" that Commerce might apply the expected method in this case. Indeed, as noted above, Commerce has applied the expected method in cases prior to this one. Further, in the proceedings below, the domestic interested parties filed pre-preliminary comments arguing that Commerce should assign a non-selected rate based on the AFA rate of mandatory respondents, citing *Albemarle* to argue that the largest companies are representative of exporters and producers unless evidence indicates otherwise. *See* Pre-Prelim Comments, P.R.

---

[10] On page 20 of its brief, CME notes that Commerce did not "attempt{} to select additional respondents after being notified early in AR 21-22 that the two mandatory respondents would not participate in the AR." Pl. Br. at 20. CME does not explain why this fact is relevant to the Court's analysis of the dumping behavior of non-selected respondents, nor did CME develop any distinct argument on this point. *See United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) (It is "well established that arguments ... not appropriately developed in a party's briefing may be deemed waived."); *see also Baley v. United States*, 942 F.3d 1312, 1331 (Fed. Cir. 2019) (Issues that are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

47 at 8-9. Therefore, plaintiff was on full notice that the non-selected company rate was at issue, and had an opportunity to respond.

In *Bowe-Passat*, which plaintiff cites to bolster its accusation of "sandbagging" by Commerce, the Court found that Commerce failed to provide adequate guidance on data deficiencies, resulting in an unfair rejection of timely filed data. *Bowe-Passat v. United States*, 17 C.I.T. 335, 341-343 (1993). In contrast, here, Commerce did not "mislead" plaintiff into thinking that data it had provided were sufficient – indeed, plaintiff provided no data at all. Moreover, Commerce's application of the expected method in the final results, rather than pulling forward an outdated non-selected rate, was consistent with statutory requirements and settled guidance from the Federal Circuit that places the burden of rebutting the presumption of representativeness on the party seeking departure from the expected method. *See*, *e.g.*, *PrimeSource*, 111 F.4th 1330; *Albemarle*, 821 F.3d at 1353.

Plaintiff similarly argues that Commerce's decision to depart from the expected method in the preliminary results meant that it had no reason to request that Commerce allow it to supplement the record by submitting data after the record had closed. Pl. Br. at 20. Plaintiff's argument, however, ignores that "preliminary results are not final." *Government of Argentina v. United States*, 542 F.Supp.3d 1380, 1391 (CIT 2021) (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("Preliminary determinations are 'preliminary' precisely because they are subject to change.").

Moreover, in addition to the pre-preliminary comments filed by the domestic interested parties in the proceedings below, discussed above, we recall that the domestic interested parties also argued in their case brief that Commerce should use the expected method to calculate the non-selected rate rather than pulling forward the 4.30 percent rate. Indeed, CME filed a rebuttal

case brief asserting that this argument was incorrect.  *See generally* Domestic Interested Parties' Case Brief; CME Rebuttal Brief.  Therefore, CME was on notice that this issue was before Commerce for consideration, but at no point did plaintiff deign it appropriate to seek to supplement the record.  Plaintiff seeks to absolve itself of this omission through this lawsuit, by cherry-picking the Federal Circuit's holdings in prior cases such as *Bestpak* and *Changzhou Hawd* to propose a standard of review that is untethered to the Federal Circuit's settled case law. The Court should not allow plaintiff a second bite at the apple in these circumstances.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's motion for judgment on the administrative record, sustain Commerce's final results in its entirety, dismiss the complaint, and enter judgment in favor of the United States.

Respectfully yours,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

OF COUNSEL:

JACK DUNKELMAN
Attorney
Department of Commerce
Office of the Chief Counsel
for Enforcement and Compliance
U.S. Department of Commerce

/s/ Ravi D. Soopramanien
RAVI D. SOOPRAMANIEN
Trial Attorney
U.S. Department of Justice
 Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
(202) 616-0856
Fax: (202) 307-0972
Email: Ravi.Soopramanien@usdoj.gov

*Attorneys for Defendant*

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that this brief complies with the word limitation in Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 7,016 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

<u>/s/ Ravi D. Soopramanien</u>