Slip Op. 25-91

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

CME ACQUISITIONS, LLC,

       Plaintiff,

v.

UNITED STATES,

       Defendant,

and

OUTOKUMPU STAINLESS USA, LLC
and NORTH AMERICAN STAINLESS,

       Defendant-Intervenors.

</td><td>

Before:  Gary S. Katzmann, Judge
Court No. 24-00032

</td></tr>
</table>

## OPINION

[Plaintiff's Motion for Judgment on the Agency Record is denied.]

Dated: <u>July 18, 2025</u>

<u>Ned H. Marshak</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, N.Y., argued for Plaintiff CME Acquisitions, LLC.  With him on the briefs were <u>Jordan C. Kahn</u> and <u>Eve Q. Wang</u>, of Washington, D.C.

<u>Collin T. Mathias</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States.  With him on the briefs were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Claudia Burke</u>, Deputy Director, and <u>Ravi D. Soopramanien</u>, Trial Attorney.  Of Counsel on the briefs was <u>Jack Dunkelman</u>, Office of the Chief Counsel for Enforcement and Compliance, U.S. Department of Commerce.

<u>Deanna Tanner Okun</u>, <u>Lydia C. Pardini</u>, <u>Alissa Chase</u>, and <u>Joonho Hwang</u>, Polsinelli PC, of Washington, D.C., for Defendant-Intervenor Outokumpu Stainless USA LLC.

<u>William H Jones Jr.</u>, VanAntwerp Attorneys, LLP of Ashland, KY, for Defendant-Intervenor North American Stainless.

Katzmann, Judge: This case arises from the U.S. Department of Commerce's ("Commerce") final determination of the 2021–22 administrative review of the antidumping duty order on stainless steel sheet and strip ("stainless steel") in coils from Taiwan. See Stainless Steel Sheet and Strip in Coils from Taiwan: Final Results of Antidumping Duty Admin. Rev. and Final Determination of No Shipments; 2021-2022, 89 Fed. Reg. 902 (Dep't Com. Jan. 8, 2024), P.R. 68 ("Final Results"); Compl. ¶ 1, Mar. 6, 2024, ECF No. 9.

The two mandatory respondents selected for the review notified Commerce that they were unable to complete the mandatory respondent questionnaire by the deadline provided. See Letter from N. Marshak & E. Wang to G. Raimondo, Sec'y of Com., re: S-More and Lien Kuo Questionnaire Responses 2021–2022 (Nov. 23, 2022), P.R. 32. Where "necessary information is not available on the record" and "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may use adverse facts available to calculate that party's antidumping margin. 19 U.S.C. § 1677e(a)(1), (b)(1). Accordingly, in its preliminary results, Commerce assigned the mandatory respondents an adverse facts available antidumping duty rate of 21.10 percent and the non-selected companies a rate of 4.30 percent. See Stainless Steel Sheet and Strip in Coils from Taiwan: Prelim. Results of Antidumping Duty Admin. Rev. and Prelim. Determination of No Shipments; 2021-2022, 88 Fed. Reg. 20481, 20482–83 (Dep't Com. Apr. 6, 2023), P.R. 51 ("Prelim. Results"). After receiving briefs from various interested parties, Commerce published its final results, calculating a higher rate of 21.10 percent for the non-selected companies by averaging the adverse facts available rates for the two mandatory respondents. See Final Results at 902–03. Thus, the non-selected companies were assigned the same dumping rate as the unresponsive mandatory respondents, 21.10 percent. See Mem. from J. Maeder to A. Elouaradia, re: Issues and Decision Mem. for the

Final Results of the Antidumping Duty Administrative Review; 2021-2022 at 13, 15 (Dep't Com.

Dec. 29, 2023), P.R. 67 ("IDM").  Commerce noted that it "has no substantial evidence on [the]

record that the non-examined companies' dumping was different from that of the mandatory

respondents, or that the mandatory respondents are otherwise not representative of the market."

Id. at 15.  Plaintiff CME Acquisitions, LLC ("CME"), as a U.S. importer of stainless steel in coils

and a non-selected company in the 2021–22 administrative review at issue, challenges the dumping

rate applied to the non-selected companies.  See Compl. ¶¶ 1, 4.

This case raises two issues: (1) whether Commerce's decision to apply a 21.10 percent rate

to non-selected companies was supported by substantial evidence and in accordance with law and

(2) whether CME had sufficient notice and opportunity to submit evidence that the 21.10 percent

rate did not reasonably reflect its dumping margin.  On the first issue, the court concludes that

Commerce calculated a rate equal to the expected method—a weighted average of the adverse

facts available rates—and that CME did not meet its burden to show that the 21.10 percent rate is

not reasonably reflective of the non-selected companies' potential dumping margin.  On the second

issue, the court concludes that CME had ample notice and opportunity to provide evidence to the

contrary.  Thus, Commerce's determination is supported by substantial evidence and otherwise in

accordance with law.  The court denies Plaintiff's motion for judgment on the agency record and

sustains Commerce's Final Results.

## BACKGROUND

### I.    *Legal Background*

#### A.    *Antidumping Duties*

Under 19 U.S.C. § 1673, Commerce is authorized to impose antidumping duties on

"foreign merchandise [that] is being, or is likely to be, sold in the United States at less than its fair

value."  Those duties are equal to "the amount by which the normal value of the merchandise

exceeds the export price."  Id. § 1673e(a)(1).  Generally, Commerce is charged with "determin[ing]

the individual weighted average dumping margin for each known exporter and producer of the

subject merchandise."  Id. § 1677f-1(c)(1).  However, where this is "not practicable" due to the

"large number of exporters" involved in the review, Commerce may limit its examination to a

"reasonable number" of exporters, referred to as mandatory respondents.  Id. § 1677f-1(c)(2).

Commerce selects mandatory respondents based on the information available to it at the time of

selection, "often limit[ing] mandatory respondents to those with the largest volume of exports."

Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1372 (Fed. Cir. 2013); see

also 19 U.S.C. § 1677f-1(c)(2)(A), (B).  Commerce determines the individual dumping margin for

each mandatory respondent "based upon analysis of sales and cost data collected from the

respondent via an antidumping questionnaire."  Bestpak, 716 F.3d at 1372; see also PrimeSource

Bldg. Prods., Inc. v. United States, 111 F.4th 1320, 1324 (Fed. Cir. 2024).  If a mandatory

respondent "fail[s] to cooperate by not acting to the best of its ability to comply with a request for

information," Commerce calculates an antidumping duty rate using "an inference that is adverse

to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C.

§ 1677e(b)(1).

### B.    All-Others Rate

After Commerce calculates the duty rates for the mandatory respondents, it must then

calculate an "all-others" rate for the non-selected companies.  See id. § 1673d(c)(1)(B)(i).

Generally, the all-others rate is "equal to the weighted average of the estimated weighted average

dumping margins established for exporters and producers individually investigated, excluding any

zero and de minimis margins, and any margins determined entirely" using adverse facts available

under § 1677e.  Id. § 1673d(c)(5)(A).  However, where the rates for all individually investigated

respondents are zero, de minimis, or based entirely on adverse facts available, Commerce "may

use any reasonable method to establish the estimated all-others rate for exporters and producers

not individually investigated, including averaging the estimated weighted average dumping

margins determined for the exporters and producers individually investigated."  Id.

§ 1673d(c)(5)(B).  The Statement of Administrative Action provides further guidance on the

§ 1673d(c)(5)(B) exception, explaining that the "expected method" is "to weight-average the zero

and de minimis margins and margins determined pursuant to the facts available, provided that

volume data is available."  See Statement of Admin. Action Accompanying the Uruguay Round

Agreements Act, H.R. Doc. No. 103-316, at 873 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040,

4201 ("SAA").[1]

## II.    *Factual Background*

On July 27, 1999, Commerce published an antidumping order on Taiwanese stainless steel

in coils.  See Notice of Antidumping Duty Order; Stainless Steel Sheet and Strip in Coils from

United Kingdom, Taiwan, and South Korea, 64 Fed. Reg. 40555 (Dep't Com. July 27, 1999)

("Order").  On September 6, 2022, at the request of Defendant-Intervenors Outokumpo Stainless

USA, LLC and North American Stainless (collectively, "Defendant-Intervenors"), Commerce

initiated the eleventh administrative review of the Order with a period of review of July 1, 2021 to

June 30, 2022.  See Letter from D. Tanner Okun & W. Jones Jr. Atkins to G. Raimondo, Sec'y of

Com., re: Petitioners' Request for Initiation of Administrative Review (July 29, 2022), P.R. 2;

---

[1] According to the Uruguay Round Agreements Act, the SAA "shall be regarded as an authoritative
expression by the United States concerning the interpretation and application of the Uruguay
Round Agreements and this Act in any judicial proceeding in which a question arises concerning
such interpretation or application."  19 U.S.C. § 3512(d).

<u>Initiation of Antidumping and Countervailing Duty Administrative Reviews</u>, 87 Fed. Reg. 54463 (Dep't Com. Sept. 6, 2022), P.R. 7.

Because the 2021–22 administrative review covered sixty-one exporters and producers, Commerce selected two companies as mandatory respondents: Lien Kuo Metal Industries Co., Ltd. ("Lien Kuo") and S More Steel Materials Co. ("S More").  <u>See</u> Mem. from A. Hart to J. Pollack, re: 2021-2022 Administrative Review of the Antidumping Order on Stainless Steel Sheet and Strip in Coils from Taiwan: Resp't Selection (Dep't Com. Oct. 7, 2022), P.R. 16 ("Resp't Selection Mem.").  Commerce sent an initial questionnaire to the two mandatory respondents on October 19, 2022.  <u>See</u> Letter from R. Janz, to Lien Kuo Metal Indus. Co., re: Request for Information (Dep't Com. Oct. 19, 2022), P.R. 18; Letter from R. Janz to S More Steel Materials Co., re: Request for Information (Oct. 19, 2022), P.R. 19.  On November 23, 2022, the mandatory respondents notified Commerce that neither company would "be able to complete this project in a timely manner."  Letter from N. Marshak & E. Wang to G. Raimondo, Sec'y of Com., re: S-More and Lien Kuo Questionnaire Responses (Nov. 23, 2022), P.R. 32.

On April 6, 2023, Commerce issued its preliminary results assigning an adverse facts available rate of 21.10 percent to both non-responsive mandatory respondents.  <u>See</u> <u>Prelim. Results</u> at 20483.  Commerce assigned the non-selected companies an all-others rate of 4.30 percent, corresponding to the rate assigned to the non-selected companies in the most-recent previous review (the 2007–08 administrative review).  <u>See</u> <u>id.</u>

Defendant-Intervenors filed a case brief on May 8, 2023, arguing that Commerce erred in applying the 4.30 percent rate to the non-selected companies, and arguing that Commerce has a "long-established practice" of applying an average of the adverse facts available rates to the non-selected companies.  Letter from W. Jones & D. Okun to G. Raimondo, Sec'y of Com., re:

Case Brief Submitted on Behalf of Domestic Interested Parties at 1 (May 8, 2023), P.R. 52

("Domestic Parties Case Br.").  CME filed a rebuttal brief, arguing that Commerce's preliminary

all-others rate of 4.30 percent should stand because it was consistent with judicial precedent and

Commerce's administrative practice.  See Letter from N. Marshak & E. Wang to G. Raimondo,

Sec'y of Com., re: CME Reply Brief in Support of Commerce's Preliminary Results at 10 (May

15, 2023), P.R. 57 ("CME Reply Br.").

On January 8, 2024, Commerce issued its final results, maintaining the adverse facts

available rate of 21.10 percent for the two mandatory respondents.  See Final Results at 903.

Unlike in the preliminary results, Commerce also applied a 21.10 percent rate to the non-selected

companies, calculated by averaging the adverse facts available rates of the two mandatory

respondents.  See Final Results at 902–03.  Explaining its final decision, Commerce stated:

> We find that the record does not indicate that the [adverse facts available] rate
> assigned to the mandatory respondents is not reasonably reflective of the likely
> behavior of the non-selected companies during the [period of review].  In addition,
> we do not find that assigning a non-selected rate based on the rates assigned to the
> mandatory respondents pursuant to the expected method is not feasible.
> Accordingly, for our final results, and consistent with our practice and the
> prevailing law, we have applied the "expected method," as intended by Congress,
> and assigned a simple average of the [adverse facts available] rates applied to the
> mandatory respondents to the companies not selected for individual examination.

IDM at 8–9.

### III.    *Procedural History*

On February 6, 2024, CME brought this action in the U.S. Court of International Trade

("USCIT") against Defendant the United States ("the Government") challenging the Final Results.

See Summons, Feb. 6, 2024, ECF No. 1; Compl. ¶ 6.  On August 21, 2024, CME filed a motion

for judgment on the agency record, arguing that Commerce's final determination in the 2021–22

administrative review is not supported by substantial evidence and is otherwise not in accordance

with law.  See Pl.'s Mot. for J. on the Agency R. at 1, Aug. 21, 2024, ECF No. 31 ("Pl.'s Br.").

On November 26, 2024, both the Government and the Defendant-Intervenors filed responses in

opposition to plaintiff's motion for judgment on the agency record.  See Def.'s Resp. in Opp'n to

Pl.'s Mot. for J. on the Agency R. at 1, Nov. 26, 2024, ECF No. 36 ("Gov't Br."); Def.-Inters.'

Resp. to Pl.'s Mot. for J. on the Agency R. at 1, Nov. 26, 2024, ECF No. 35 ("Def.-Inters.' Br.").

On January 21, 2025, CME filed its reply brief.  See Pl.'s Reply Br. in Supp. of Mot. for J. on

Agency R., Jan. 21, 2025, ECF No. 39 ("Pl.'s Reply").

On February 11, 2025, CME filed an unopposed motion for oral argument, see Pl.'s Mot.

for Oral Arg., Feb. 11, 2025, ECF No. 44, which the court granted, see Order, Feb. 11, 2025, ECF

No. 45.  The court issued substantive questions to the parties in advance of oral argument and

solicited written responses.  See Qs. for Oral Arg., Mar. 14, 2025, ECF No. 48.  The parties timely

submitted responses to the court's questions.  See Def.'s Resp. to Ct.'s Qs., Mar. 28, 2025, ECF

No. 49 ("Gov't OAQ Resp."); Pl.'s Resp. to Ct.'s Qs., Mar. 28, 2025, ECF No. 50 ("Pl.'s OAQ

Resp.").  The court held oral argument on April 17, 2025. See Order, Apr. 4, 2025, ECF No. 51.

The parties filed supplemental briefs following oral argument.  Pl.'s Post Arg. Submission, Apr.

24, 2025, ECF No. 53; Gov't Post Arg. Submission, Apr. 24, 2025, ECF No. 54.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(B)(iii).  Under 19 U.S.C. § 1516a, "the court shall hold unlawful any determination,

finding or conclusion found . . . to be unsupported by substantial evidence on the record, or

otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1).  A determination is supported

by substantial evidence "if a reasonable mind might accept the evidence to support the finding."

PrimeSource, 111 F.4th at 1328 (citing Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

## DISCUSSION

The U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit") recently sustained Commerce's calculation of an all-others rate by averaging two identical adverse facts available rates in <u>PrimeSource</u>, 111 F.4th 1320.  Because the facts of this case closely mirror those in <u>PrimeSource</u>, the analysis here largely tracks that of the Federal Circuit's there.

In <u>PrimeSource</u>, just as here, Commerce selected the two largest exporters of the subject merchandise as mandatory respondents and assigned both the same adverse facts available rate. <u>PrimeSource</u>, 111 F.4th at 1325–26.  Commerce then used the "expected method"—calculating a weighted average of those two rates—to produce an all-others rate equal to the adverse facts available rate.  <u>Id.</u> at 1326 (averaging two adverse facts available rates of 78.17 percent to calculate an identical all-others rate of 78.17 percent).  The plaintiffs there, just as here, argued that Commerce was required to calculate an all-others rate that was "reasonably reflective of the non-selected respondents' potential dumping margin," and that assigning an all-others rate equal to the adverse facts available rate was unreasonable.  <u>Id.</u> at 1328.  Additionally, just as here, the plaintiffs argued that the mandatory respondents were not representative, rendering the expected method unreasonable.  <u>Id.</u> at 1331.

In <u>PrimeSource</u>, the Federal Circuit concluded that (1) Commerce does not have an affirmative burden to justify use of the expected method, and (2) "the non-selected respondents bear the burden of providing evidence that the results of the expected method would not reasonably reflect the[ir] potential dumping margins."  <u>Id.</u> at 1332 (quoting <u>PrimeSource Bldg. Prods., Inc. v. United States</u>, 46 CIT __, __, 581 F. Supp. 3d 1331, 1341 (2022)).  Additionally, the Federal Circuit stated that (1) "[t]he mandatory respondents are presumed representative of the non-selected respondents," and that (2) that presumption is rebuttable by the party wishing to

depart from the expected method. Id. at 1331–32. Ultimately, the Federal Circuit found that Commerce's decision to apply the expected method was supported by substantial evidence and in accordance with law because the respondents failed to demonstrate that the expected method produced results not reasonably reflective of their potential dumping margins. Id. at 1334.

As noted, the facts of this case nearly mirror those of PrimeSource: Commerce selected the two largest exporters as mandatory respondents, Commerce assigned both mandatory respondents identical adverse facts available rates, and Commerce assigned an all-others rate equal to the adverse facts available rates. However, the case here differs from PrimeSource in one regard: while "[t]here [was] no dispute that Commerce employed the expected method" in PrimeSource, id. at 1331, parties do raise such a dispute here. In the Final Results here, Commerce stated that it "applied the 'expected method,' as intended by Congress, and assigned a simple average of the [adverse facts available] rates applied to the mandatory respondents to the companies not selected for individual examination." IDM at 9 (emphasis added). CME argues that Commerce, in applying a simple average, did not use the expected method in this case such that PrimeSource does not control. See Pl.'s Br. at 15. While Commerce acknowledged that it used a simple average to calculate the all-others rate, see IDM at 8–9, a simple average of two identical values produces the same result as a weighted average of those two identical values.[2] Thus, Commerce, in applying a simple average of two identical values, calculated a rate that reflects the weighted average and

_____

[2] A simple average consists of the sum of each value divided by the number of values (e.g., $(x + y)/2$). A weighted average consists of a sum of each value multiplied by its respective weighting factor divided by the sum of the weighting factors (e.g., $(x{*}w_1 + y{*}w_2)/(w_1 + w_2)$). In this way, a weighted average is a mean where some values in the dataset contribute more than others. Where all values are identical, the weighting factor becomes irrelevant and a weighted average is equal to a simple average (e.g., $(x{*}w_1 + x{*}w_2)/(w_1 + w_2) = (x + x)/2$).

thus applied, in form and function, the expected method.[3]  As a result, the Federal Circuit's analysis in PrimeSource controls the result here as outlined below.

Based on the reasoning below, and in accordance with PrimeSource, the court concludes that Commerce's calculated all-others rate is supported by substantial evidence and in accordance with law.  Additionally, the court finds that CME had sufficient notice and opportunity to provide evidence to support Commerce's application of a lower all-others rate.

## I.   Commerce's Calculated All-Others Rate of 21.10 Percent Is Supported by Substantial Evidence and in Accordance with Law

CME argues that Commerce's application of a simple average of two total adverse facts available rates to non-selected companies is not supported by substantial evidence and is not in accordance with law.  See Pl.'s Br. at 12.  The court concludes that Commerce properly applied the expected method to calculate the all-others rate and that CME did not provide substantial evidence on the record to justify the use of a different method to calculate a lower all-others rate.

---

[3] Recall that Commerce reported that "we have applied the 'expected method,' as intended by Congress, and assigned a simple average of the [adverse facts available] rates applied to the mandatory respondents to the companies not selected for individual examination."  IDM at 9.  To the extent that Commerce erred in referring to their mathematical formula as a "simple average" rather than a "weighted average," this is harmless error.  See Matra Americas, LLC v. United States, 48 CIT __, __, 681 F. Supp. 3d 1339, 1365 (2024) (quoting Sea-Land Serv., Inc. v. United States, 14 CIT 253, 257, 735 F. Supp. 1059, 1063, aff'd and adopted per curiam, 923 F.2d 838 (mem.) (Fed. Cir. 1991)) (Harmless error principles "dictate that the court will not set aside agency action, even if procedurally erroneous, 'unless the errors were prejudicial to the party seeking to have the action declared invalid.' ").  CME maintains that it was harmed by the application of a simple average because "the difference between relying on a 'simple average' and a 'weighted average' is the difference between relying on Bestpak or PrimeSource."  Pl.'s OAQ Resp. at 1.  This argument hinges on the incorrect assertion that PrimeSource and Bestpak create different controlling principles that Commerce must follow in assigning dumping rates depending on whether Commerce applies a simple or a weighted average.  Because PrimeSource and Bestpak both require Commerce to apply rates that are reasonable and which relate to actual dumping margins, see infra I.A.2, CME cannot assert harm stemming from reliance on one case versus the other.

### A.    Commerce's All-Others Rate of 21.10 Percent Is Not a Deviation from the Expected Method and Is Presumptively Reasonable

CME states that the "overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." Pl.'s Br. at 15 (quoting Bestpak, 716 F.3d at 1379). According to CME, Commerce's Final Results are not supported by substantial evidence and are contrary to law because Commerce "did not consider 'fairness or accuracy' " in calculating the all-others rate. Id. at 16–17 (quoting Bestpak, 716 F.3d at 1380). The Government counters that "[p]rinciples of fairness and accuracy do not override the statute, and Commerce complied with the statute in this case." Gov't Br. at 12.

Recall that where dumping rates for all mandatory respondents are zero or de minimis or are estimated using facts available under 19 U.S.C. § 1677e, "the administering authority may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B). The SAA further states that "[t]he expected method in such cases will be to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." SAA at 4201. The SAA also instructs that "if this [expected] method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods" to calculate the rate for the companies not selected for individual examination in this review. Id.

In PrimeSource, the Federal Circuit clarified that a weighted average of the mandatory respondents' rates is the expected method even when "all mandatory respondents receive an [adverse facts available] rate." 111 F.4th at 1329. There, as outlined above, the Federal Circuit

upheld Commerce's calculation of the all-others rate by averaging two identical adverse facts available rates.  Id. at 1326.

Here, the dumping rates for all mandatory respondents were estimated using facts available under 19 U.S.C. § 1677e.  Thus, Commerce was permitted to use "any reasonable method" to determine the all-others rate.  19 U.S.C. § 1673d(c)(5)(B).  Commerce calculated a simple average of the two identical adverse facts available rates, reporting that it "applied the 'expected method.' " IDM at 9.  As indicated above, Commerce's calculation of a simple average of two identical values is identical to a weighted average.  Thus, Commerce calculated an all-others rate that reflects the expected method.

The SAA states that Commerce may use other "reasonable methods," but only after concluding that the expected method is "not feasible" or "results in an average that would not be reasonably reflective of potential dumping margins."  SAA at 4201.  Thus, the expected method is a presumptively reasonable method for determining the all-others rate.  "The burden is on Commerce to justify a departure from the expected method, not to justify its use."  PrimeSource, 111 F.4th at 1330.  Commerce does not have "an affirmative burden . . . to investigate the non-selected respondents and determine that the expected method produced results reasonably reflective of their dumping margin" because such a burden "would contravene the purpose of those statutory provisions that allow Commerce to limit the number of parties individually investigated under certain circumstances."  Id.  Instead, "the party that desires Commerce to deviate from the expected method bears the burden to identify and present substantial evidence on the record that either the expected method was 'not feasible' or produced results not 'reasonably reflective of potential dumping margins for non-investigated exporters or producers.' "  Id.

> 1.    *Commerce's Application of a Simple Average Does Not Change the Rate's Presumptive Reasonableness*

Because the simple average here resulted in the same rate that a weighted average would have produced, the fact that Commerce applied a "simple average" in this case does not create an affirmative burden on Commerce to justify a departure from the expected method.  It is not the mathematical equation, but the "result[]" of that calculation that must "be reasonably reflective of potential dumping margins" for non-selected companies.  SAA at 4201.  As outlined above, the result of a weighted average is presumptively reasonable.  Where the rate resulting from a simple average is identical to the rate that would result from a weighted average, that rate is also presumptively reasonable.  It serves no purpose to impose an affirmative burden on Commerce to justify its use of one method versus another where the result is the same.  If CME believes that the all-others rate of 21.10 percent—reflecting both a weighted average and a simple average of the two identical 21.10 adverse facts available rates for the mandatory respondents—does not reasonably reflect its potential dumping rate, it has the burden to provide substantial evidence to that effect.

> 2.    **<u>Bestpak</u> Does Not Change the Rate's Presumptive Reasonableness**

CME argues that the Federal Circuit's decision in <u>Bestpak</u> supports placing an affirmative burden on Commerce to consider " 'fairness [and] accuracy' and the principle that 'rate determinations for nonmandatory, cooperating separate rate respondents must also bear some relationship to their actual dumping margin.' "  Pl.'s Br. at 16 (quoting <u>Bestpak</u>, 716 F.3d at 1380).  CME also suggests that the Federal Circuit's holding in <u>PrimeSource</u> does not change Commerce's obligation to consider whether the all-others rate is reasonable.  <u>See</u> Pl.'s Br. at 15.

In <u>Bestpak</u>, Commerce departed from the expected method, and thus had an affirmative obligation to "determine, based on substantial evidence, that the expected method is not feasible

or would not be reasonably reflective of the potential dumping margin of the non-selected

respondents." PrimeSource, 111 F.4th at 1330 (citing Changzhou Hawd Flooring Co. v. United

States, 848 F.3d 1006, 1012 (Fed. Cir. 2017)). In Bestpak, like here, Commerce "used 'a simple

average rather than a weighted average.' " Id. at 1330–31 (quoting Bestpak, 716 F.3d at 1378).

However, unlike the case here, Commerce's application of a simple average in Bestpak represented

a true deviation from the expected method because Commerce averaged two different rates—a de

minimis rate and an adverse facts available rate of 247.65 percent—resulting in an all-others rate

of 123.83 percent. See Bestpak 716 F.3d at 1375. In such a situation, the result of a simple average

is not identical to the result of a weighted average and Commerce must justify its deviation from

the expected method. In contrast, here Commerce averaged two identical adverse facts available

rates of 21.10 percent resulting in an all-others rate of 21.10 percent. In such a situation, the results

of a simple average are identical to a weighted average such that the calculated rate is

presumptively reasonable.

In Bestpak, the Federal Circuit noted Commerce's statement that "normally[,] it would

determine the separate rate through a weighted average of dumping margins," but instead "applied

the exception found in § 1673d(c)(5)(B) and took a simple average of the two rates." Id. Here, in

contrast, Commerce noted that it "applied the 'expected method' as intended by Congress[] and

assigned a simple average of the [adverse facts available] rates applied to the mandatory

respondents to the companies not selected for individual examination." IDM at 9 (emphasis

added). Because Commerce deviated from the expected method in Bestpak, the Federal Circuit

went on to state that the all-others rate "assigned was required to reflect commercial reality and

thus, to be 'a reasonably accurate estimate' of actual dumping rates." 716 F.3d at 1380. The

principles outlined in Bestpak are consistent with PrimeSource and do not create a new affirmative

burden on Commerce to justify a rate that reflects the expected method.  Instead, PrimeSource indicates that the expected method results in a rate that presumptively is fair, is accurate, and bears a relationship to the actual dumping margin.  Here, Commerce's all-others rate is equal to the rate produced by a weighted average and thus it presumptively reflects commercial reality and reasonably accurately estimates actual dumping rates.  Bestpak does not change a rate's presumptive reasonableness where it is calculated using the expected method.

### 3.    Commerce Did Not Act Contrary to Past Practice

CME argues that "Commerce's decision to apply an [adverse facts available] rate to 'all[-]others' companies in this review constitutes a stark departure from how the Department had treated 'all[-]other' companies in prior segments" and "is contrary to the Department's practice in contemporaneous decisions in other cases."  Pl.'s Br. at 18.  The Government counters that Commerce "does not . . . have an established practice of pulling forward rates where all mandatory respondents receive margins based on total [adverse facts available]" and that Commerce "is free to depart from [any] practice where it provides a reasonable explanation for doing so."  Gov't Br. at 20.

CME first cites to the proceedings in Certain Quartz Surface Products from India, where Commerce pulled forward the all-others rate calculated in the underlying investigation.  See Mem. from S. Fullerton to L. Wang, re: Certain Quartz Surface Products from India: Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review; 2019-2021 at 55, Case No. A-533-889, Bar Code: 4326250-02 (Dep't Com. Dec. 30, 2022).  While Commerce there found "the most reasonable approach in assigning a rate to the non-selected companies in this instance [wa]s to pull forward the all-others rate calculated in the underlying investigation," Commerce first determined that "the expected method [wa]s not reasonably reflective of the

potential dumping margins of the non-selected companies." Id. at 55 (emphasis added). In contrast, here Commerce stated that it "applied the 'expected method,' " and found that the 21.10 rate is "reasonably reflective of the likely behavior of the non-selected companies during the [period of review]." IDM at 8–9. As indicated above, "[t]he burden is on Commerce to justify a departure from the expected method, not to justify its use." PrimeSource, 111 F.4th at 1330.

CME also notes that Commerce "applied a 4.30 percent rate to 19 non-selected respondents" in the last full review. Pl.'s Reply at 6 (citing Stainless Steel Sheet and Strip Coils from Taiwan: Final Results of Antidumping Duty Administrative Review, 75 Fed. Reg. 76700, 76702 (Dep't Com. Dec. 9, 2010)). Again, Commerce does not have an affirmative burden to justify its use of the expected method. See PrimeSource, 111 F.4th at 1330. Because pulling forward rates from past reviews is a departure from the expected method, the party asking for such a method must justify its use with substantial evidence on the record regardless of what Commerce did in prior reviews.

"When all mandatory respondents receive a rate that is . . . based entirely on [adverse facts available] rates, Commerce's statutory obligation is to select 'any reasonable method,' not the most reasonable method." Id. at 1335 (emphasis in original) (quoting 19 U.S.C. § 1673d(c)(5)(B)). Commerce's all-others rate here reflects a reasonable method, namely the expected method. Commerce does not have an affirmative burden to justify its use of the expected method, as it is presumptively reasonable. See id. at 1330.

### B.    CME Did Not Show That the All-Others Rate of 21.10 Percent Is Not Reasonably Reflective of Non-Selected Companies' Potential Dumping Margins

As indicated above, "the party that desires Commerce to deviate from the expected method bears the burden to identify and present substantial evidence on the record that either the expected

method was 'not feasible' or produced results not 'reasonably reflective of potential dumping margins for non-investigated exporters or producers.' " Id. (quoting SAA at 4201). CME failed to meet this burden.

First, CME failed to demonstrate that the expected method was not feasible. Recall that the "expected method" is to "weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." SAA at 4201. CME suggests that "the expected method could not be used" because "volume data was not available." Pl.'s Reply at 5. Volume data is only necessary to calculate the weighting factor, see supra n.2, which is irrelevant when calculating a weighted average of two identical values. Regardless, Commerce included volume data in the record, demonstrating that it was available and could be used to calculate the weighted-average rate. See generally Mem. from A. Caton to The File, re: Release of U.S. Customs and Border Production Entry Data (Dep't Com. Sept. 7, 2022), P.R. 6, C.R. 1–2.

Second, CME failed to demonstrate that the all-others rate is not reasonably reflective of non-selected companies' potential dumping margins. "The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006, 1012 (Fed. Cir. 2017) (quoting Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1353 (Fed. Cir. 2016)). For this reason, "[t]he mandatory respondents are presumed representative of the non-selected respondents." PrimeSource, 111 F.4th at 1331. This presumption is rebuttable: "a party wishing to depart from the expected method can satisfy its burden by showing that the non-examined respondents' dumping is different from the mandatory respondents." Id. at 1331–32.

**1.** **_Commerce's Respondent Selection Process Does Not Undermine Representativeness_**

CME suggests that Commerce "showed data for merely three companies . . . undermin[ing] the Department's conclusion that the selected respondents were representative of the exporters subject to review." Pl.'s Br. at 19–20. CME's reliance on the respondent selection process to show a lack of representativeness is without merit. Commerce regularly relies on Customs and Border Protection data for all entries of subject merchandise and selects the respondents with the largest volume of imports, consistent with 19 U.S.C. § 1677f-1(c)(2)(B). See PrimeSource, 111 F.4th at 1325 & n.2. "The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." Albemarle, 821 F.3d at 1353.

While the Respondent Selection Memorandum only includes data for the three largest exporters and/or producers, see Resp't Selection Mem. at Attach. 1, Commerce reviewed data covering all 61 companies, see Mem. from A. Caton to The File, re: Release of U.S. Customs and Border Protection Entry Data at 1 (Dep't Com. Sept. 7, 2022), P.R. 6, C.R. 1–2. The fact that Commerce only included data for three largest respondents in its Respondent Selection Memorandum does not undermine the presumption that the mandatory respondents are representative here.

**2.** **_Commerce's Use of Adverse Facts Available Rates to Calculate an All-Others Rate Does Not Undermine Representativeness_**

CME also suggests that Commerce's decision to average two adverse facts available rates is not supported by substantial evidence or in accordance with law. See Pl.'s Br. at 13. During the administrative review, CME argued that there was not "substantial evidence that the [adverse facts available] rate has a reasonable relationship to the economic reality of [non-selected]

companies." CME Reply Br. at 7. To the extent that CME argues that the use of adverse facts available rates to calculate an all-others rate undermines the presumption of representativeness, it is without merit.

The statute contemplates the use of adverse facts available rates to calculate an all-others rate, and the Federal Circuit has upheld all-others rates where Commerce averaged two identical adverse facts available rates. See PrimeSource, 111 F.4th at 1334 ("Commerce's decision to apply the expected method [by calculating a weighted average of two adverse facts available rates of 78.17 percent], resulting in a 78.17 [percent] all-others rate, to the non-selected respondents was . . . supported by substantial evidence and in accordance with law."). As the Federal Circuit noted in PrimeSource, "[t]he mere fact that all mandatory respondents received an [adverse facts available] rate cannot, in and of itself, undermine the presumption of representativeness." 111 F.4th at 1332. CME did not show that the non-examined respondents' dumping was different from the mandatory respondents', and thus did not rebut the presumption that the mandatory respondents in this case are representative. As a result, Commerce's conclusion that the expected method is "reasonable because the record evidence does not rebut the presumption that the margins assigned to the mandatory respondents are representative of the non-selected companies in this review" is supported by substantial evidence and in accordance with law. IDM at 8.

Commerce calculated an all-others rate here that reflects the expected method. Any party that desires Commerce to deviate from the expected method bears the burden of showing that the expected method is either not feasible or produces results that are "not 'reasonably reflective of potential dumping margins' " for non-selected companies. PrimeSource, 111 F.4th at 1330 (quoting SAA at 4201). CME did not provide substantial evidence to demonstrate that the expected method was not feasible nor that the all-others rate here is "not reasonably reflective" of

its dumping margin.  Therefore, Commerce's all-others rate of 21.10 percent is supported by substantial evidence and in accordance with law.

## II.    *CME Had Sufficient Notice and Opportunity to Submit Evidence that the 21.10 Percent Rate Did Not Reasonably Reflect Its Dumping Margin*

CME argues that, because Commerce assigned a 4.30 percent all-others rate in the preliminary results, "interested parties had no reason to believe that Commerce would reverse course in its final determination" and "had no reason to believe that they needed to place additional information on the record to establish that their [all-others] rate was closer to 4.3[0] percent . . . tha[n] it was to 21.1[0] percent."  Pl.'s Br. at 20.  The Government counters that CME had notice because "Commerce has applied the expected method in cases prior to this one" and because "the domestic interested parties filed pre-preliminary comments arguing that Commerce should assign a non-selected rate based on the [adverse facts available] rate of mandatory respondents."  Gov't Br. at 21.

CME had opportunity to provide evidence that the expected method was not reasonable in this case.  The expected method is just that: expected.  CME's suggestion that it "had no reason to believe" that Commerce might apply the <u>expected</u> method in this case is inapposite.  The SAA itself provides parties with notice of this fact: the "expected method . . . [is] to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available."  SAA at 4201.  CME had the same opportunity as any other party to submit factual evidence to support calculation of the all-others rate using a different, non-expected method.  See 19 C.F.R. § 351.301(c)(3)(ii).  The domestic interested parties demonstrated actual knowledge that Commerce's calculation of the all-others rate was at issue here when they submitted pre-preliminary comments arguing that Commerce should calculate the all-others rate by "averaging the estimated weighted-average dumping margins determined for the companies

individually investigated," and that "[t]he rate applied to [the mandatory respondents] should [thus] also be applied to all the other non-selected respondents that shipped subject merchandise to the United States during the [period of review] of this proceeding."  Letter from W. Jones Jr. and D. Tanner Okun to G. Raimondo, Sec'y of Com., re: Domestic Interested Parties' Pre-Preliminary Comments at 7 (Feb. 17, 2023), P.R. 47.  The domestic industry again raised arguments that Commerce should apply of a 21.10 all-others rate in their later case brief.  <u>See</u> Domestic Parties Case Br. at 3 ("[The] 4.30 percent rate is inconsistent with the SAA and Commerce's long-established practice, and Commerce must correct this error in its final determination").  CME, like the domestic interested parties, had reason to know that Commerce could apply the expected method to calculate the all-others rate unless an interested party demonstrated that the expected method was not feasible or did not reasonably reflect the potential dumping margins of non-selected respondents.  Even though Commerce is "expected" to weight-average the mandatory respondents' adverse facts available rates to calculate an all-others rate, CME did not attempt create a factual record that would establish that this method was not reasonably reflective of its actual dumping margin.  CME's arguments regarding notice are thus without merit.

Commerce's 21.10 percent all-others rate reflects the expected method of weight-averaging adverse facts available rates of the mandatory respondents.  The party who desires a deviation from the expected method has the burden to provide evidence that the expected method is not feasible or that the results of the expected method do not reasonably reflect the potential dumping margins of the non-selected companies.  CME asked Commerce to pull forward a lower 4.30 percent rate from a past review, and thus desired a deviation from the expected method.  However, CME did

not meet its burden of demonstrating that the expected method was not feasible or that the 21.10

percent rate was not reasonably reflective of the non-selected parties potential dumping margins.

## CONCLUSION

For the reasons stated above, Commerce's determination is supported by substantial

evidence and is in accordance with law.  Therefore, the court denies CME's motion and sustains

Commerce's <u>Final Results</u>.  Judgment will enter accordingly.

**SO ORDERED.**

*/s/ Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: <u>July 18, 2025</u>
        New York, New York